# George T. Welch

## v.

# Marvin M. and Sylvia G. Barrows

[218 A.2d 698]

February Term, 1966

Present: **Holden, C. J., Shangraw, Barney, Smith and Keyser, JJ.**

Opinion Filed April 5, 1966

*Paterson, Gibson & Noble* for plaintiff.

*William S. Burrage* for defendants.

**Keyser, J.** This is an action in equity brought by the plaintiff to obtain a mandatory injunction to enforce a restrictive agreement existing on land owned by the defendants. The plaintiff seeks the removal of three cabins from defendants' land on which plaintiff claims the restriction operates.

The court, after hearing, entered decree for the plaintiff on its findings of fact. The case is here on appeal by the defendants.

The controlling issue in controversy is the location of the area upon which the building restriction applies. Defendants concede this area is "all we are interested with in this case."

In 1870 one Carlos Kimball owned a farm of about 200 acres in the Town of Ferrisburg, Vermont. A portion of the land bordered on Lake Champlain. Kimball divided land in an area called Kimball's Point into shore lots which were later sold. In deeds of these lots, Kimball included an agreement that no buildings were to be built on a lot which he retained along the shore of the lake in the Point area.

The point is in the northwesterly section of the area. The lake then forms a bay area down shore, called Kimball's Bay. The land up shore runs slightly to the northeast. The shore lots are laid out 5 rods wide along this shore and have a depth of 8 rods. Lot No. 1 is nearest to the Bay area.

The shore lots abut on a roadway about 33 feet wide below which are several lots called Back Lots. Back Lot No. 1 is opposite shore Lots Nos. 1 and 2.

We are concerned only with the land which lies westerly and northwesterly of Lot No. 1 and Lot No. 1 Back to the lake·Bay and Point

areas. A survey plan of the Kimball's Point area, an exhibit in the case, was recorded September 21, 1909 in Book 24, Page 118 of the Ferrisburg Land Records. To add clarity to the opinion we have reproduced a sketch not to scale, from the survey to show the lots involved and the restricted area referred to in the Kimball deeds.

The defendants became owners of the remainder of the Kimball farm in 1950 which included this land on the lake shore. In early December 1961, they commenced the construction of three cabins on land lying between the lake and the westerly property line of Lot No. 1 and Back Lot No. 1. In February 1962, the plaintiff learned of this and objected to it by letter from his attorney to the defendants. Construction of the cabins was completed the following spring.

There is no disagreement between the parties that the clause in question in the several deeds is a restrictive agreement. As such, it is enforceable in equity. *Queen City Park Assoc.* v. *Gale,* 110 Vt. 110, 116, 3 A.2d 529.

This brings us to the real and fundamental question — the location of the area on which the restrictive agreement applies.

Paragraph (3) of the decree is material to the import of Paragraph (4) so we quote both.

"(3) The defendants, their agents, servants, heirs, executors, administrators and assigns are perpetually restrained and enjoined from erecting or causing to be erected any buildings or structures whatsoever on Kimball's Point and from creating or causing to be created thereon any obstruction or hindrance to the use by plaintiff, and his heirs and assigns of the same, pursuant to plaintiff's various easements, rights of way and servitudes therein, which are described in Findings (6), (7), (8) and (9) of the Findings of Fact made in this cause."

"(4) For the purpose of this decree, Kimball's Point is defined as an area shown on a map entitled 'Survey of Kimball's Point' recorded in Volume 24, of the Town of Ferrisburg Land Records at page 118, and not divided into building lots on said plan."

The plaintiff claims support for Paragraph (4) in Findings Nos. 12. and 13. The pertinent part of No. 12 reads: ". . . (T)he land on Kimball's Point not heretofore sold as a camp lot, has been used in common by all owners of camp lots as well as the owner of the farm."

The opening sentence of Finding No. 12 says, "On that property still owned in fee by the defendants, located on Kimball's Point Grounds three camps were erected subsequent to November 1, 1961."

LAKE CHAMPLAIN

Dock

Point

Lot No. 1   Lot No. 2   Lot No. 3   Lot No. 4

Kimball's
Bay

Roadway

No. 1 Back          No. 2 Back

N
W   E
S

The only reference in the findings to a map is in Finding No. 4 reading, "The Plaintiff's Exhibit No. 1 represents a map of the Kimball's Point area showing various lots."

The plaintiff claims that the restrictive covenant on defendants' land expressed in the Kimball deeds of Lots No. 1 and No. 2 inure to his benefit. The case proceeded in conformity with this theory adopted by the parties. The court found that the restrictions created in the Point Grounds by Carlos and Emily Kimball were for the benefit of all land owners in that area and were covenants running with the land.

The defendants claim the land on which the restriction rests lies between Lot No. 1 and the lake and northwesterly of a line from the southerly corner of Lot No. 1 to the Bay, where Kimball was to place a fence. They argue that this is the lot described in the deed of Carlos Kimball to Charles W. B. Kidder in 1888.

The plaintiff, to the contrary, claims the Point Grounds lie between Lot No. 1 and Lot No. 1 Back and the lake and northwesterly of a fence which for many years ran from the southerly corner of *Lot No. 1 Back* to the southerly end of a stone retaining wall near the lake shore built in 1922.

Plaintiff's ownership of Lots No. 3 and No. 4 originates in two deeds. The deed of Lot No. 3 given by the common owner Carlos Kimball to H. Addison Hickok in 1898 recites: "Said grantor shall not build any house or other buildings on the Point grounds or give general public a right of way over the same."

Emily Kimball (widow of Carlos Kimball) conveyed Lot No. 4 to Hattie Welch in 1909. The deed provides in part: "and every and all other rights and privileges as have been granted by Carlos Kimball to former purchasers." This deed thus incorporates by reference rights previously granted in the deeds to other lot owners.

The record shows an apparent general plan, or intent, by Carlos Kimball to provide certain rights and privileges by grant for the benefit of the persons purchasing shore lots laid out on his premises. This intent was carried into effect by the inclusion of the covenants in the several subsequent deeds.

There are three other former deeds given by Carlos Kimball containing the restrictive covenant, (1) to J. L. St. Peters (1899), (2) to H. Addison Hickok (1895) and (3) to Charles W. B. Kidder (1888). The deeds to St. Peters and Hickok only state that the grantor

shall not build on the "Point grounds." They do not describe in any degree of exactness the land upon which the restrictive agreement is imposed.

The first lot sold by Carlos Kimball was to Kidder in 1888. Shore Lot No. 1 was the first lot described in the deed; the second was a small piece 2 x 3 rods in the northeast corner of Lot No. 1 Back. This back lot is situated on the opposite side of a road running nearly northeast and southeast between the shore lots and back lots. This small piece in Lot No. 1 Back is opposite shore Lot 2 and not No. 1.

Kimball's conveyance to Kidder contained the following provision:

"It is understood . . . *that said Kimball shall make a fence with convenient gate from the southerly corner of the first described lot to the Bay and the lot West of said fence and southwesterly of said Kidder's lot shall not be sold as a building or any buildings put thereon that will obstruct the view . . . ."* (Emphasis added).

This is the first and only deed from the Kimballs which locates the lot made servient to the building restriction. The reference in the other deeds is in general terms, for example, "Point Grounds." Accordingly, we must gather the intention of the parties in that deed from the words they used in order to determine the area referred to in the subsequent deeds.

The intention of the parties, not the language used, is the dominating factor, and the circumstances existing at the time of the execution of the deed, the situation of the parties and the subject matter are to be considered. *Nelson* v. *Bacon,* 113 Vt. 161, 169, 32 A.2d 140.

The agreement must be construed so as to give effect to the intention of the parties if it can be gathered from the language used when interpreted in connection with, and in reference to, the purpose sought to be accomplished and the nature and condition of the subject matter of the grant at the time the instrument was executed. *Davidson* v. *Vaughan,* 114 Vt. 243, 246, 44 A.2d 144.

"Where there is no doubt or obscurity, there is no room for construction and the instrument must be given effect according to its terms." *Aiken* v. *Clark,* 117 Vt. 391, 393, 92 A.2d 620.

In that situation the meaning is then a question of law, and the intention so manifested cannot be altered by evidence or findings of extraneous circumstances. *Davidson* v. *Vaughan,* supra, at p. 246, 247.

The Kidder deed provided that Kimball shall make a fence *"from*

*the southerly corner of the first described lot to the Bay."* The first described lot is shore Lot No. 1. This language is plain and clear and unmistakably fixes the location of this fence line.

The deed then specified with clarity that the lot impressed with the covenant is to be located with relation to this fence line and the shore lot conveyed to Kidder. This is the expressed intention of the parties. Whether the fence was built in 1888, or was ever built, is immaterial to the issue here, but its proposed location plainly fixed by the deed is vital.

The language of the deed fixes the lot west of the above-described fence and southwesterly of Kidder's shore lot as the lot on which the building restriction operates. The lot thus described is the land between the lake and Lot No. 1 and upshore from a line extending from the southerly corner of Lot No. 1 to Kimball's Bay. Simply stated it is the land which lies only betwen Lot No. 1 and the lake as shown by the sketch.

The restricted building area on Kimball's Point, as defined in the Kidder deed, determines that the lower cabin is not within the restricted area. But the upper cabin and approximately one-half of the middle cabin are within that area in violation of the covenant. The findings do not support paragraph (4) of the decree and it was error for the court to order the removal of all three cabins.

The defendants also excepted to paragraph (2) of the decree as not being supported by the findings.

Paragraph 2 is as follows:

"(2)  The defendants are ordered and commanded to rebuild and restore the fence destroyed by them on or after November 1, 1961, located between Kimball's Point and a dirt or gravel road southerly of said Point, said fence running in a westerly direction to Kimball's Bay in Lake Champlain. Said fence shall be restored on or before October 1, 1965."

The land between the lake and the westerly line of Lot No. 1 and Lot No. 1 Back, as the court found, is owned by the defendants. This land is a part of the original Kimball farm. The fence in question was on this land of defendants. There is no finding which establishes that plaintiff had the right to keep and maintain any fence on defendants' land at the place in question. The deeds themselves do not grant any such right. Furthermore, the findings are silent as to whether the defendants "destroyed" the fence, or even that it was "destroyed."

Carlos Kimball's deed (1898) to H. Addison Hickok of Lot No. 3 recites that "Persons owning or buying land on the first two lines of lots shall unite with Kimball in maintaining all necessary fences, but extending the same both shall be done by Kimball or parties buying there maintained as above." The deed also recited, "Said Kimball will not be responsible for damages done by horses or cattle in or about the pasture roads."

It is apparent from this deed and the others that fences and gates were necessary only to restrain horses and cattle from straying onto the land being sold in the area. This is the finding of the chancellor. There is no present necessity for the fence in question, nor is any benefit to the plaintiff by such fence, disclosed by the evidence.

There is no basis in fact or law on which paragraph (2) of the decree can issue or stand. The exception of the defendants to this provision of the decree is sustained.

The defendants moved to dismiss the complaint during the hearing while plaintiff was being cross-examined. The court denied the motion and defendants took an exception. The motion is based on the claim that the evidence did not establish that legal title to Lots No. 3 and No. 4 was vested in the plaintiff.

The contention of the defendants is untenable. The record discloses that equitable ownership to these lots is in the plaintiff. Under such circumstances equity regards this as the real ownership. 73 C.J.S., Property, §13, pp. 183, 192.

Moreover, at the time defendants moved to dismiss, the court had not made and filed its findings of fact. For this reason alone the motion was premature and properly denied. *N.E. Road Machinery Co.* v. *Calkins,* 121 Vt. 118, 122, 149 A.2d 734.

The defendants contend it was error for the chancellor to refuse to find as requested on their defense of an abandonment of the rights claimed by the plaintiff and other owners of lots in the area and their predecessors in title. They contend that the findings requested indicate an abandonment of the rights claimed by the plaintiff. The only right at issue here is the enforcement of the restrictive covenant running in favor of the plaintiff and other lot owners.

Finding No. 17 of the court reads:

"17. The Court further finds that various summer camp people have at various times changed the land in question by, for example, erected a stone retaining wall, an underground drainage pipe,

erecting a garage that encroaches on a road, by allowing the dock to fall into disrepair, but the Court cannot find that such acts on the part of various campers have abandoned and terminated the restrictions and easements and covenants running with the land."

■ The question of abandonment is one of fact and the burden of proof on this issue was on the defendants. See 1 Am. Jur. 2d, Abandoned etc., §39-41.

■ "An easement created by deed is not extinguished by mere non-user, no matter how long continued." *Nelson* v. *Bacon,* supra, at p. 172, citing cases.

■ Chief Justice Moulton further said at p. 172: "In order to establish an abandonment there must be, in addition to non-user, acts by the owner of the dominant tenement conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its future existence."

The evidence introduced by the defendants on this issue fails to meet the requirements of this rule. The evidence on which the requested findings are based do not reach the heart of the dispute. Much of it relates to irrelevant acts and conduct on the part of the plaintiff and other lot owners, and their predecessors in title which had nothing to do with the restricted area. As against the plaintiff the only evidence was that he had used the shore area to burn brush and rubbish. He did, however, make a timely objection to the construction of the cabins.

By its finding the court obviously found no manifest present intent by the plaintiff to relinquish the restrictive covenant which it must have done to bring this issue within the doctrine of *Nelson* v. *Bacon,* supra.

Furthermore, there are no facts or evidence relied upon by the defendants which establish abandonment at matter of law. Defendants' exception is overruled.

■ The defendants also excepted to the failure of the chancellor to find that certain acts of the plaintiff and his predecessors in title were not equitable. They urge that the maxim "He who seeks equity must do equity" applies here. This exception is not well founded.

The issue is whether or not the defendants have violated the restrictive agreement, or easement rights, running in favor of the plaintiff. Under such circumstances, if there is a violation, it is the clear duty of the. court to follow the law and protect the plaintiff's legal rights. *Richard Paul, Inc.* v. *Union Improvement Co.,* 33 Del. Ch. 113, 91 A.2d 49, 55.

A review of the evidence referred to by the defendants does not indicate any circumstances arising from the plaintiff's actions which a court of equity will recognize as having created equitable rights in the defendants. Id.

Furthermore, the record does not disclose any action of the plaintiff from which he has gained an advantage over the defendants in the matter in issue. See 30 C.J.S., Equity, §90-91. The defendants have failed to point out what the plaintiff must do equitably to entitle them to equitable relief.

The maxim has no application to the facts in this case.

The defendants also urge the court erred by its failure to find or decree respecting "comparative damage." They claim that since this is an action for a mandatory injunction that "comparative damages" was an issue in the case. We do not agree with defendants' contention.

■ Where there is an intrusion or invasion of an adjoining landowner's realty by his neighbor through some means or structure permanent in nature, as a building or wall, a mandatory injunction is a proper remedy to invoke to compel the removal of the encroachment. Anno. 28 A.L.R. 2d 683, 686.

Many courts have taken the position that it is proper to consider the balance of convenience or relative hardship which would result from granting or denying the mandatory injunction. Ibid, p. 699 and cases there cited.

But here, there is no encroachment by defendants on plaintiff's realty. The cabins were built on land owned by the defendants themselves, and the court so found.

Although plaintiff places his action in the category of a mandatory injunction, strictly speaking, it is not. More accurately, it is an action for an ordinary decree for an abatement and thereby enforce the restrictive covenant in question by the removal of the cabins. The phrase, in strict terminology, should be confined to preliminary or interlocutory injunctions. *Richard Paul, Inc.* v. *Union Improvement Co.,* supra, at 91 A.2d 54, citing 4 Pomeroy's Equity Jurisprudence, (5th Ed.), §1359.

■ Whether there will be a greater hardship on the defendants than benefit to the plaintiff has no application here to the award of final relief to the plaintiff for the protection of established legal rights.

Moreover, the defendants knew, or are charged with knowledge, of the restrictive agreement in the deeds. They also had received plain-

tiff's objection to the erection of the cabins shortly after they started construction. Under such circumstances the defendants acted at their own peril by completing the erection of the cabins without first obtaining a resolution of the disputed rights.

"He who takes land with notice of a restriction upon it will not in equity and good conscience be permitted to act in violation of the terms of the restriction." See *Queen City Park Assoc.* v. *Gale,* supra, at p. 118.

In Finding No. 13 the chancellor appeared to have reached the same result we have by finding that one and one-half of the three cabins were located northerly of a fence erected at least fifty years earlier. The fence referred to in the finding was located southerly of all three cabins and plaintiff challenges the finding on that basis. He claims it is not founded on the evidence. We agree as stated that the finding is contrary to the evidence that the three cabins are northerly of the old fence which ran from the southwest corner of Lot No. 1 Back to a stone retaining wall built in 1922. The plaintiff testified that this fence was standing in 1907 when he was nine years old. However, this error in the finding does not alter the result reached.

The court in Paragraph (3) of its decree refers to plaintiff's various easements, rights of way and servitudes "which are described in Findings (6), (7), (8), and (9) of the Findings of Fact made in this cause." Although no exception is taken to this, we take occasion to note that this decree will be recorded and ought to contain all of the essential ingredients necessary to identify the rights referred to. This would clarify the meaning of the decree and avoid a resort to the findings. Not only would this be an inconvenience but it is conceivable that a situation could develop whereby it would be impossible to determine what the findings thus referred to were.

*Decree is reversed and cause remanded for entry of a new decree establishing the restricted area in accordance with the views herein expressed and ordering the removal of the two northerly cabins.*