2005 VT 56

**Sheldon GARDNER v. William JEFFERYS III, Susan Jefferys, George Soules and Janice Soules**

[878 A.2d 259]

No. 04-022

¶ 1. May 4, 2005. Plaintiff Sheldon Gardner appeals the superior court's determination that a restrictive covenant in his deed runs with the land to the benefit of adjacent landowners, defendants George and Janice Soules and defendants William and Susan Jefferys. We affirm.

¶ 2. In 1957, William Jefferys Jr. and his wife Ena, the parents of defendant William Jefferys III, purchased approximately two hundred acres of farm land in Fayston, Vermont known as the Strong Farm. Beginning in 1966, the elderly Jefferys began selling off parcels of the farm. In 1969, plaintiffs Sheldon and Carin Gardner purchased, by warranty deed, a ten-acre parcel of undeveloped land from the Jefferys. The deed contains a restrictive covenant providing that a specified

> part of the premises ... shall forever be and remain open and free of all buildings and structures, except the right to construct on said open land a private swimming pool, and/or tennis court, and, the usual fences and structures appurtenant thereto and such other buildings and structures as meet the approval, in writing of the Grantors herein, their heirs and assigns.

¶ 3. The provision further states that rights secured therein are "to be enjoyed by the Grantors, their heirs and assigns." In 1975, the Jefferys conveyed a five-acre parcel of land to Karin Souminen, who, in turn, sold the parcel to George and Janice Soules in 1987. The Soules moved to Vermont and began to reside on the property in 1990, after they constructed a house there. Their property is located above the Gardners' land. In 1979, the elderly Jefferys conveyed the remainder of their Fayston property to their son, William Jefferys III, and his wife, Susan.

¶ 4. In the late summer and early fall of 1999, the Gardners wrote to William

and Susan Jefferys twice requesting approval to build a two-story structure within the area restricted by the above-quoted covenant. The Jefferys gave the Soules a copy of the request. In June 2000, one month after the Gardners obtained a permit to build a fifteen-foot accessory structure in the restricted area, the Soules wrote the Gardners a letter advising that they were interested parties to the restrictive covenant. In September 2000, after receiving a letter from the town zoning administrator informing them that the posts and net placed on their open field were more similar to a temporary badminton or volleyball net than a permanent tennis court requiring a permit, the Gardners filed a declaratory judgment action seeking a determination of the effect of the restrictive covenant in their deed. The Soules responded by filing a counterclaim.

¶ 5. In May 2001, the Gardners began constructing a shed in the restricted area. Shortly thereafter, the superior court granted the Soules' request for a preliminary injunction halting the construction. In the fall of 2001, the Gardners began planting white pines in the restricted area directly in the Soules' view. The Soules sought to enjoin the Gardners from planting the trees, but, following a hearing, the superior court denied the request for a preliminary injunction. In July 2003, following four days of a hearing on the merits of the declaratory judgment action, the superior court ruled that the benefit of the restrictive covenant ran with the land and was enforceable by both the Soules and the Jefferys, and that the Gardners had violated the covenant by commencing construction of the proposed shed and by planting trees in the restricted area. Accordingly, the court enjoined the continued existence of the shed and the trees. Further, the court prohibited the Gardners from allowing plants or crops

in the restricted area to exceed six feet in height. On appeal, plaintiff Sheldon Gardner argues that the superior court erred (1) by concluding that the restrictive covenant runs with the land to the benefit of the Soules and the Jefferys; (2) by requiring him to ensure that vegetation in the restricted area does not exceed six feet in height; and (3) by determining that the restrictive covenant prohibits him from constructing the proposed shed and planting the trees.

¶ 6. Plaintiff first contends that the restrictive covenant does not run with the land to the benefit of defendants because the parties intended the covenant to bind only the grantors, their heirs and assigns, and neither the Soules nor the Jefferys are heirs or assigns of the grantors. We do not find this argument persuasive. Four requirements must be met for a restrictive covenant to "run with the land" so that successor property owners may enforce its burdens and benefits: (1) the covenant must be in writing; (2) the parties to the covenant must have intended that the covenant run with the land; (3) the covenant must "touch and concern" the land; and (4) privity of estate must exist between the parties. *Rogers v. Watson*, 156 Vt. 483, 487, 594 A.2d 409, 411 (1991). Plaintiff argues only that the second requirement is not met in this case. Intent that a restrictive covenant is to run with the land may be either express or implied, and may be shown by extraneous circumstances. *Id.* at 488, 594 A.2d at 412; see *Welch v. Barrows*, 125 Vt. 500, 504, 218 A.2d 698, 702 (1966) ("The intention of the parties, not the language used, is the dominating factor, and the circumstances existing at the time of the execution of the deed, the situation of the parties and the subject matter are to be considered."). In some instances, a covenant is "so intimately connected with the land as to require the conclusion that the necessary intention for the running of the benefit is present

absent language clearly negating that intent." *Albright v. Fish*, 136 Vt. 387, 393, 394 A.2d 1117, 1120 (1978). For example, we have held that a covenant prohibiting placing a particular type of structure on a property is such a restriction. See *Rogers*, 156 Vt. at 488, 594 A.2d at 412. Indeed, unless the terms of a restrictive covenant provide otherwise, when a property benefitted by a restrictive covenant is divided into separately owned parcels, "[e]ach separately owned parcel is entitled to enforce [the] ... covenant benefitting the property." Restatement (Third) of the Law of Property: Servitudes § 5.7(2) (2000).

¶ 7. Here, plaintiff argues that the restrictive covenant in his deed does not run with the land because it expressly benefits only the grantors and their heirs and assigns, thereby implying an intent not to allow the covenant to be enforced by successors to the land who are not heirs or assigns. Plaintiff further states that neither the Soules' deed nor the Jefferys' deed includes an assignment from the elderly Jefferys, and that the Jefferys are not heirs because Ena Jefferys is still alive, and they did not obtain the land through inheritance. According to plaintiff, they would never have purchased the property with the restrictive covenant if they thought that an indefinite number of successors could dictate how they used their property. We conclude that the record in this case overwhelmingly demonstrates that the parties intended the restrictive covenant to run with the land. The testimony of several witnesses, including Ena Jefferys, unequivocally demonstrated that the covenant was intended to keep the restricted area, which had always been an open meadow, "forever" open and free of any obstructions that would diminish the view from the grantors' remaining lands located above the meadow. Moreover, the record, including evidence of negotiations surrounding the covenant and of the Gardners' subsequent conduct, demonstrates that the Gardners were aware of this intent.

¶ 8. Notwithstanding plaintiff's argument to the contrary, use of the term "assigns" rather than "successors" does not suggest that the parties intended to preclude subsequent owners of the dominant estate from enforcing the covenant. To the contrary, "[i]t is well settled that where a restrictive covenant contains words of succession, i.e., 'heirs and assigns,' a presumption is created that the parties intended the restrictive covenant to run with the land." *Weeks v. Kramer*, 696 A.2d 361, 363 (Conn. App. Ct. 1997). The word "assignee" is generally defined as "[o]ne to whom property rights or powers are transferred by another." Black's Law Dictionary 114 (7th ed. 1999). As Black's Dictionary states:

> Use of the term is so widespread that it is difficult to ascribe positive meaning to it with any specificity. Courts recognize the protean nature of the term and are therefore often forced to look to the intent of the assignor and assignee in making the assignment — rather than to the formality of the use of the term *assignee* — in defining rights and responsibilities.

*Id.* As noted, the record demonstrates that the parties intended the covenant to run with the land. Moreover, the fact that the grantors added the word "successors" to the term "heirs and assigns" in later covenants does not demonstrate that they intended the word "assigns" to have a more restrictive meaning in the instant covenant. The covenants were written years apart and appear to have several boilerplate terms to express the grantors' intent that the covenants run with the land.

¶ 9. Next, plaintiff argues that the superior court erred by construing the restrictive covenant to prohibit him from planting trees in the restricted area, and that, by doing so, the court imposed a burden on his property greater than that imposed by the restrictive covenant. We disagree. Generally, in construing a deed, the trial court must "'give effect to the intention of the parties if it can be gathered from the language used when interpreted in connection with, and in reference to, the subject matter and purpose sought to be accomplished at the time the instrument was executed.'" *Creed v. Clogston*, 2004 VT 34, ¶ 17, 176 Vt. 436, 852 A.2d 577 (quoting *McDonough v. W.W. Snow Constr. Co.*, 131 Vt. 436, 441, 306 A.2d 119, 122 (1973)); see *Welch*, 125 Vt. at 504, 218 A.2d at 702 (intention of the parties is dominating factor). Although the trial court may employ various rules of construction in interpreting a covenant, including the general rule that restrictive covenants should not be extended by implication, such rules are merely subordinate aids to the court's ultimate goal of determining the parties' intent. *Creed*, 2004 VT 34, ¶ 17; see *County of Addison v. Blackmer*, 101 Vt. 384, 389, 143 A. 700, 701 (1928) (although restrictive covenants are ordinarily construed strictly, "the intention of the parties is the thing to be determined, and all rules of construction are subordinate aids to its discovery"); cf. *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 810 P.2d 27, 28 (Wash. Ct. App. 1991) (while restrictive covenants were once disfavored, "modern courts have recognized the necessity of enforcing such restrictions to protect the public and private property owners" from urbanization pressures; primary objective in interpreting restrictive covenant is to determine intent of parties).

¶ 10. If the language of a restrictive covenant is clear and unambiguous, the covenant is given effect according to its terms. *Creed*, 2004 VT 34, ¶ 13. Normally, the trial court determines, as a question of law, whether a covenant is ambiguous, and in doing so, may consider the circumstances surrounding the making of the covenant. *Id.* An ambiguity exists when the language of the document supports a different interpretation from that which appears when the language is considered in light of the surrounding circumstances, and both interpretations are reasonable. *Id.* If a covenant is determined to be ambiguous, the question of the parties' intent is one of fact to be determined based on all of the evidence. *Id.* ¶ 18. We review the trial court's findings of fact under a clearly erroneous standard, and thus we will uphold those findings unless there is no reasonable or credible evidence to support them, taking the evidence in a light most favorable to the prevailing party and excluding the effect of modifying evidence. *Id.*

¶ 11. In this case, the covenant requires that the restricted area "shall be forever open and free of all buildings and structures," apart from the right to construct "on said open land" the usual structures appurtenant to a swimming pool or tennis court. The trial court made no explicit finding on whether the covenant is ambiguous, but rather determined that it was intended to maintain unobstructed views from the north to the south. We conclude that both the language of the covenant and evidence of the circumstances surrounding the making of the covenant support the court's determination. Notwithstanding plaintiff's arguments to the contrary, the word "open" is nonsensical as an adjective modifying the phrase "of all buildings and structures." Rather, the latter phrase is connected only to the word "free," while the word "open" stands apart and refers to the land that had historically been maintained as an open field. This interpretation is reinforced by

the use of the term "open land" later in the same sentence.

¶ 12. The question, then, is what the parties meant by "open." The record demonstrates that most of the restricted area had been mowed or hayed for several decades or more when the restrictive covenant was signed. Ena Jefferys, one of the original grantors, testified that she always assumed that the phrase "open and free of all buildings and structures" meant that nothing would interfere with the view, which was "everything up there" and the reason why people bought property there. Indeed, plaintiff himself acknowledged that he bought his property, at least in part, for the view, and that the word "open" in the covenant did not necessarily refer to buildings and structures. In short, there was overwhelming evidence that the intent underlying the restrictive covenant at issue here was to maintain the restricted area as an open meadow, thereby allowing unobstructed views to the south for the benefit of adjoining neighbors. Therefore, the superior court did not increase the burden imposed under the covenant by requiring the Gardners to ensure that vegetation in the restricted area remained below six feet in height.

¶ 13. Moreover, even if we were to construe the critical phrase of the restrictive covenant as meaning only that the restricted area was to be kept free of buildings and structures except those expressly allowed, we would still uphold the trial court's order prohibiting the Gardners from planting trees within the area. Other courts have interpreted the word "structure" or "fence" to include a row of trees when such an interpretation furthered the purpose and intent of the covenant or statutory provision. In *Witrak*, for example, the restrictive covenant foreclosed the erection of a fence over six feet in height. After considering that the purpose of the covenant was to preserve an open appearance in

the community, the court concluded that even the literal meaning of the word "fences" did not exclude a row of trees that acted as a barrier. *Witrak*, 810 P.2d at 29-30. In another case involving a spite fence statute that prohibited any maliciously erected "structure" that was in the nature of a fence, the court held that "a row of trees, arranged in a line by the person who planted them, could easily constitute a 'structure.'" *Wilson v. Handley*, 119 Cal. Rptr. 2d 263, 267 (Ct. App. 2002); see *Dowdell v. Bloomquist*, 847 A.2d 827, 830 (R.I. 2004) (accord). Here, the evidence at trial demonstrated that the row of trees plaintiff planted acted as a structure obstructing the view to the south, in violation of the restrictive covenant.

¶ 14. We also reject plaintiff's argument that the superior court's earlier ruling refusing to temporarily enjoin the Gardners from planting trees is the "law of the case" with respect to whether the restrictive covenant prohibited them from planting trees in the restricted area. The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Morrisseau v. Fayette*, 164 Vt. 358, 364, 670 A.2d 820, 824 (1995) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). The doctrine is only a rule of practice, however, which the court may disregard under the proper circumstances. Thus, a court ruling on an issue of law in the course of denying a motion for summary judgment retains the power to reopen what had previously been decided. *Morrisseau*, 164 Vt. at 364, 670 A.2d at 824. Here, the superior court denied the Soules' request for a temporary injunction in an interim order. The court did not consolidate the hearing on the Soules' request with a trial on the merits of the case. See V.R.C.P. 65(b)(2) (court may order trial on merits of action

to be advanced and consolidated with hearing on application for preliminary injunction). Indeed, the merits hearing did not take place until nearly two years later. Further, the court limited the scope of the hearing on the application for a temporary injunction, stating that it was not interested in conducting a trial within a trial. Under these circumstances, the superior court's construction of the restrictive covenant in denying a temporary injunction was not "the law of the case," and, in any event, the court was not precluded from later rendering a different decision based on a fully developed evidentiary record. See *Converse v. Town of Charleston*, 158 Vt. 166, 169, 605 A.2d 535, 537 (1992) (even if pretrial judge had decided issue on its merits, trial judge retained power to reopen what had been decided).

¶ 15. Finally, plaintiff argues that the superior court erred by prohibiting them from constructing the shed and ordering them to remove the already installed footings for the shed. According to plaintiff, the proposed shed is consistent with a structure used to service a residential swimming pool and tennis court, and nothing in the deed prohibits the Gardners from maintaining the construction remnants on their property even if the shed cannot be built. We find no error. The restrictive covenant allows only "usual" structures "appurtenant" to a pool or tennis court. The evidence demonstrated that the Gardners had not built, or even planned, a swimming pool or tennis court, and that the shed would be out of proportion for use in conjunction with a pool or tennis court. Therefore, the court did not err by enjoining construction of the shed. Moreover, the footings are within the restricted area, which the covenant requires to be kept "open and free of all buildings and structures," except for those designated therein. The footings did not fit within the covenant's exception and therefore must be removed.

*Affirmed.*

Motion for reargument denied June 21, 2005.