2011 VT 51

## David Smalley v. Stowe Mountain Club, LLC

[25 A.3d 539]

No. 10-204

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 20, 2011

---

54

*Russell D. Barr* and *Daniel A. Seff* of *Barr & Associates, P.C.*, Stowe, for Plaintiff-Appellee.

*Christopher D. Roy* of *Downs Rachlin Martin PLLC*, Burlington, for Defendant-Appellant.

¶ 1. **Burgess, J.** In this dispute between neighboring landowners, defendant Stowe Mountain Club, LLC (SMC) appeals from a judgment in favor of plaintiff David Smalley on his claim that portions of a golf course built and operated by SMC violate restrictive covenants in Smalley's deed. SMC contends that, in granting declaratory and injunctive relief in favor of Smalley, the trial court: (1) misconstrued the deed; (2) erroneously refused to allow additional discovery relating to certain contested issues; and (3) exceeded the proper scope of injunctive relief. We agree with the first two claims, and therefore reverse and remand.

¶ 2. The undisputed material facts may be summarized as follows. Smalley's property consists of a single-family residence on a 1.97 acre parcel located on Spruce Peak Road in the Town of Stowe. The property was acquired by Smalley's predecessor-in-interest, Nancy Cooke, in a 1959 deed from the Mount Mansfield Company (MMC), which operates the Stowe Mountain Resort. The deed contained sixteen separate "restrictions and conditions" to be "treated as covenants running with the land," nearly all of which were concerned with maintaining the property's residential quality. The first condition provided that no building on the property "shall be used for purposes other than a private dwelling." Others required that the cost of the residence and garage to be constructed on the property "shall be not less" than a certain dollar amount; that the "design and materials" for the exterior of all buildings to be constructed must be "approved in writing by an architect" designated by MMC; that "the premises and buildings constructed thereon shall at no time be used or occupied for the purpose of any trade, manufacture or business or as a school, hospital, charitable institution, hotel, inn, motel, cabin, boarding house, lodging house or place of public resort"; that no "billboards, advertising signboards or signs of any kind" were to be

erected on the property; that no animals were to be kept on the property except for dogs, cats, or stabled horses; and that no timber or trees were to be cut except as necessary to the residential development of the property.

¶ 3. Following the list of restrictions and conditions, the deed additionally stated:

> It is understood between the Grantor and the Grantee herein that the conditions, restrictions and covenants in this deed are for the purposes of this deed only and may vary from those in deeds of other property heretofore, now or hereafter owned by the Grantor, except that land within 200 ft. of the boundaries of the lot here conveyed to Grantee shall be sold and conveyed by the Grantor subject to the same conditions, restrictions and covenants as are contained in this deed.

¶ 4. Over the next several years, MMC subdivided and sold a number of additional residential lots on Spruce Peak Road in the vicinity of the Smalley property, all subject to the conditions and restrictions set forth in the 1959 deed. Most of the lots, like the Smalley parcel, adjoined land owned and used by MMC for resort purposes such as ski trails and access to the resort and resort parking. In 1977, Cooke and MMC entered into a second warranty deed "to correct any errors or deficiencies" relating to a boundary in the original deed. The corrected deed provided that it was "subject to certain covenants and restrictions of a residential nature as more specifically set forth" in the original 1959 deed. In January 1994, Cooke conveyed the property to Smalley. Like the corrected deed, the Smalley deed made the conveyance "subject to certain covenants and restrictions of a residential nature as more specifically set forth" in the original 1959 deed and, with one exception not relevant here, further provided that "[t]he balance of the covenants and restrictions" in the 1959 deed "shall remain valid and in effect."

¶ 5. In 2005 and 2006, SMC constructed a golf course in the area of Spruce Peak. Portions of two holes are located within 200 feet of the Smalley lot. The construction was preceded and facilitated by two transfers, one in 2003 in which MMC conveyed the golf course property to Spruce Peak Realty, LLC (SPR), a transfer which it characterized in its tax return as a tax-exempt capital contribution, and a second in 2004 when SPR in turn

conveyed the property to its own limited liability company, SMC, similarly characterized at the time as a capital contribution.

¶ 6. The golf course opened for play in the summer of 2007. One year later, in June 2008, Smalley filed this action against SMC, alleging that the 2003 and 2004 transfers of property within 200 feet of his lot triggered the covenant prohibiting use of the property conveyed "for the purpose of any . . . business or . . . place of public resort." Accordingly, Smalley claimed that use of the property as a golf course violated his deeded property rights, and entitled him to a permanent injunction. SMC answered, denying the violation and raising a number of affirmative defenses, including estoppel, laches, and unclean hands.

¶ 7. The parties filed cross-motions for summary judgment in late 2008. Smalley argued that the restrictive covenants were unambiguous and clearly established his right to declaratory and injunctive relief. SMC claimed, to the contrary, that the golf course property was not "sold and conveyed" in 2003 and 2004 within the meaning of the 1959 deed because there was no monetary consideration or real change of ownership; the transactions were merely inter-corporate capital transfers among affiliated entities, all of whom were wholly owned or controlled by their parent corporation American International Group (AIG). Thus, it claimed that the deed restrictions were never triggered by an actual "sale" within the contemplation of the parties. Construed as a whole, it asserted, the deed evinced a clear and unambiguous intent to establish a common scheme to maintain the quality of lots sold by MMC to third parties for residential development, but there was never an intent to bar the resort itself from developing the property it retained. Thus, SMC maintained that it would defeat the parties' intentions to apply the "sold and conveyed" language to paper transactions in which the resort retained actual ownership and control of the property and sought to develop it through a wholly owned affiliate.

¶ 8. Alternatively, SMC asserted that the meaning of the deed was ambiguous and further discovery was required to determine the parties' intentions. Smalley, in response, claimed that the transfers were plainly "sales" as that term is commonly understood in the law of real estate transactions. In the event the court agreed with SMC's interpretation, however, Smalley also asserted that further discovery would be necessary to discern the "actual consideration" underlying the 2003 and 2004 transactions and "the

nature of the alleged inter-corporate relationship between SMC, SPR and MMC." In a subsequent reply memorandum, SMC raised several additional arguments, notably that the 200-foot restriction did not run with the land or benefit Cooke's successors-in-interest, and that the 1977 corrected deed had superseded the original deed and terminated the restriction.

¶ 9. The trial court heard argument and issued an amended final decision in May 2009.[1] The court rejected SMC's arguments in their entirety. It concluded that the 200-foot restriction in the 1959 deed was intended to be perpetual, not personal to the parties; that the 1977 corrective deed had not extinguished the restriction; that the restriction was "intended . . . to create a buffer zone" between the residential properties and the resort; and that the 2003 and 2004 transfers were plainly "sales" as that term is understood under conventional real estate law and therefore sufficient to trigger the 200-foot restriction. The court also determined that SMC had failed to adduce evidence to support its affirmative defenses, and that there was no likelihood additional discovery would produce a genuine issue of material fact. Following additional briefing, the court issued a final judgment in May 2010, permanently enjoining SMC from further violation of the restrictive covenant and ordering that it "remove those portions of the golf course which have been constructed within 200 feet of Smalley's property, and . . . desist from any public or business use of the said buffer zone for any and all purposes associated with said golf course." The court stayed its judgment pending this appeal.

¶ 10. SMC challenges each of the trial court's conclusions as either erroneous or premature. Beginning with the nature of the covenant, it contends the trial court erred in finding that the 200-foot restriction was enforceable by Smalley as a covenant running with the land. Four conditions have traditionally been required for a restrictive covenant to run with the land: it must be in writing; it must "touch and concern" the land; privity of estate must exist between the parties; and the parties must have intended that it run with the land. *Gardner v. Jefferys*, 2005 VT 56, ¶ 6, 178 Vt. 594, 878 A.2d 259 (mem.). Although the most recent iteration of the Restatement (Third) of Property: Servi-

---

[1] The court also issued an order in July 2009 denying a follow-up motion for reconsideration.

tudes adopts a "simplified approach" to deeded covenants, observing that under "modern American law a covenant benefit or. burden runs with the land if *intended* to do so," *id.* § 1.3 cmt. b (2000) (emphasis added), this has, in fact, been a cornerstone of Vermont law for years. See *Welch v. Barrows*, 125 Vt. 500, 504, 218 A.2d 698, 702 (1966) ("The intention of the parties, not the language used, is the dominating factor, and the circumstances existing at the time of the execution of the deed, the situation of the parties and the subject matter are to be considered.").

■ ¶ 11. SMC asserts that the parties' intentions here are self-evident from the deed language providing that the sixteen enumerated restrictive covenants "shall . . . be treated as covenants running with the land," enforceable by the grantor and its "successors or assigns" and binding upon the grantee "and all future assigns." Language of "succession," such as "heirs and assigns," is generally construed to express an intention that the restrictive covenant run with the land. *Gardner*, 2005 VT 56, ¶ 8 (quotation omitted). SMC argues, therefore, that a contrary intent may be inferred from the absence of such language within the penultimate deed provision applying the enumerated covenants to any sale or conveyance of land within 200 feet of the Cooke/Smalley property.

■ ¶ 12. The claim is unpersuasive. As the trial court here concluded, the original deed — construed as a whole — evinces a clear and unambiguous intent to create and perpetuate a high-end residential development. The enumerated residential covenants and conditions that expressly run with the land make this intent manifest. The corollary condition applying the residential restrictions to additional parcels sold and conveyed within 200 feet of the property was manifestly a part of this scheme, and integral to its future viability and implementation. Thus, it is readily apparent that — construed in context — the 200-foot restriction, like the other residential covenants, was intended to run with the land. See *Main St. Landing, LLC v. Lake St. Ass'n*, 2006 VT 13, ¶ 7, 179 Vt. 583, 892 A.2d 931 (mem.) (in discerning parties' intent, "the court must consider the deed as a whole . . . to arrive at a consistent, harmonious meaning"); *Kipp v. Chips Estate*, 169 Vt. 102, 105, 732 A.2d 127, 129 (1999) (noting that "master rule for the construction of deeds" is to determine parties' intent "from the entire instrument" which must "prevail[] over technical terms

or their formal arrangement" (quotation omitted)); *Rogers v. Watson*, 156 Vt. 483, 488, 594 A.2d 409, 412 (1991) (observing that intent to have restriction run with the land "can be implied as well as expressed" and may be inferred from surrounding deed language and circumstances); *Welch*, 125 Vt. at 504, 218 A.2d at 702 (determining whether restrictive covenant runs with the land rests parties' intent construed in light of "the circumstances, . . . the situation of the parties and the subject matter" of the deeded transaction).

■ ¶ 13. The trial court also correctly rejected SMC's claim that the 1977 deed eviscerated the restriction by failing to expressly reaffirm it. The secondary deed's sole stated purpose was to "correct" any errors in the boundaries in the original deed, and was expressly "subject" to the residential covenants and conditions contained therein. As noted, the 200-foot restriction was functionally integral to those covenants and was implicitly preserved to the same extent that they were by the corrected deed. Accordingly, we find no error.

■ ■ ¶ 14. Finally, and principally, SMC contends the trial court erred in construing the original deed to create a 200-foot "buffer zone" around the property free from resort activity, and in finding that the 2003 and 2004 corporate conveyances triggered this restriction. We review de novo the trial court's construction of the terms of a writing and whether they are ambiguous. *Creed v. Clogston*, 2004 VT 34, ¶ 13, 176 Vt. 436, 852 A.2d 577; *Morrisseau v. Fayette*, 164 Vt. 358, 366, 670 A.2d 820, 826 (1995). The plain language of the deed supports SMC's claim that the trial court erred in construing it to create a resort-free "buffer zone" around the Smalley property. The deed by its terms imposed no restriction on resort activity within 200 feet of the lot. Rather it provided that any land "sold and conveyed" by MMC within 200 feet of the property was subject to the covenant restricting resort activity. The deed is clear and unambiguous to this extent, and we are directed to no other language in the deed or extrinsic evidence reasonably suggesting a contrary meaning. See *Creed*, 2004 VT 34, ¶ 13 (reaffirming rule that, where meaning of deed term "is clear and unambiguous, there is no room for construction and the instrument must be given effect according to its terms" (quotation omitted)). Thus, we conclude that the deed does not restrict MMC from using land that it has retained within 200 feet

of the Cooke/Smalley parcel for resort activities, but instead applies only where the land has been "sold and conveyed."

¶ 15. The remaining question, therefore, is whether MMC and its successors "sold and conveyed" land within 200 feet of the Cooke/Smalley property, and thus triggered the covenant restricting its use for resort purposes. The trial court agreed with Smalley that the meaning of the phrase "sold and conveyed" was clear and unambiguous under "real property law" and plainly applied to the 2003 and 2004 inter-corporate conveyances. The salient question, however, is not what the phrase means in technical legal terms, but what it meant to the parties. See *Kipp*, 169 Vt. at 105, 732 A.2d at 129 (reaffirming "master rule" that "the intention of the parties . . . prevails over technical terms or their formal arrangement" (quotation omitted)). Because nothing in the deed prevented the resort from using its retained land for resort purposes, SMC asserts that the parties' intent was simply to ensure that residential properties sold to third parties met the aesthetic standards incorporated in the enumerated covenants and conditions. "Paper" transfers of resort property from one corporate alter-ego to another with no real change in ownership and control, therefore, should not qualify as a sale and conveyance as understood by the parties or trigger the restriction. Indeed, SMC asserts that applying the restriction to bar the resort from developing its own property would defeat the clear intent of the parties.

¶ 16. The trial court characterized the argument as "creative" but entirely without authority. The issue, however, is closer than the trial court acknowledged. Indeed, courts have held in a variety of contexts that the meaning of "sale" or "sold" may vary depending on the intent of the contracting parties, and may even require a substantive transfer of ownership. In *Premier Van Schaack Realty, Inc. v. Sieg*, 2002 UT App 173, 51 P.3d 24, for example, a realtor claimed that he was entitled to a commission from a client who transferred his property to a limited liability company. The court rejected the realtor's claim, holding that, although the LLC was a separate legal entity, the listing agreement contemplated an actual transfer of the seller's ownership interest, not a mere change in the form of ownership, and thus the transaction did not constitute a "sale or exchange" within the meaning of the contract. As the court explained, "[w]hether a sale or exchange for valuable consideration occurred is a fact-intensive

inquiry that requires more than a mere showing that an owner transferred his property to a separate legal entity." *Id.* ¶ 16. Because the facts showed that the seller retained "substantially the same ownership interest," there was no "sale or exchange as contemplated in the Agreement." *Id.*

¶ 17. A similar conclusion in a different context was reached in *Barry v. Barry*, 78 F.3d 375 (8th Cir. 1996). There, a former shareholder of a small family corporation claimed that she was entitled to additional consideration from an earlier sale of her stock under a contract provision triggered by any subsequent "sale of shares of the Corporation." *Id.* at 381. The alleged triggering event was a transfer of corporate shares in exchange for shares in another corporation, but there was no transfer of corporate ownership to outsiders. The court concluded that the meaning of "sale" in the agreement was ambiguous because it was uncertain "whether the actual control of the shares must be transferred," and therefore "remand[ed] for a jury to consider extrinsic evidence to determine whether the parties intended that the shares needed to change control in a real sense before [the plaintiff's] rights under the agreement would be triggered." *Id.* at 382. Other courts have held that a sale or conveyance may require a real change of ownership or control as well as consideration. See, e.g., *NSK, Ltd. v. United States*, 115 F.3d 965, 975 (Fed. Cir. 1997) (holding that term "sold" requires "both a transfer of ownership to an unrelated party and consideration"); *Mandell v. Gavin*, 816 A.2d 619, 625 (Conn. 2003) (finding no transfer for "consideration," an essential element of a sale, where party merely transferred property to limited liability company and "there was no bargained for exchange").

¶ 18. Thus, the construction of "sold and conveyed" advanced by SMC is not wholly unprecedented, as the trial court here concluded, and indeed finds some support in the terms of the deed construed as a whole. The covenants and conditions designed to maintain a high-end residential development, coupled with the absence of similar restrictions on land retained by the resort, could reasonably suggest that the parties did not intend to restrict development of land under the ownership or control of MMC. Therefore, the parties may not have intended to include transfers of resort property lacking any real change in ownership or control within the meaning of "sold and conveyed." Since the deed language is reasonably susceptible of more than one mean-

ing, it must be considered ambiguous. See *Kipp*, 169 Vt. at 107, 732 A.2d at 131 (holding that ambiguity will be found where writing, viewed in its entirety, fairly admits of more than one meaning). The trial court's conclusion to the contrary, therefore, was in error.

██ ██ ¶ 19. Although the trial court here found no ambiguity, it went on to find that — "[e]ven if [it] were to consider extrinsic evidence" — there was no factual support for SMC's claim that the 2003 and 2004 transfers were essentially paper transfers for no consideration. The court relied, in this regard, on the warranty deeds accompanying the transfers which recited that they were "in consideration of ten and more dollars paid to its full satisfaction" and the Vermont transfer tax returns identifying the "Total Price Paid" in each case as in excess of $200,000. These documents are not, however, dispositive of the issue. Indeed, the transfer tax returns explained that the "price paid" simply represented Stowe's current "assessed value" and that the conveyances represented merely a "[c]apital contribution to [a] limited liability company." Furthermore, information set forth in a property tax return raises only a "presumption" of accuracy which "may be fairly rebutted." *Imported Car Ctr., Inc. v. Billings*, 163 Vt. 76, 82, 653 A.2d 765, 770 (1994) (quotation omitted). Nor does the venerable doctrine of "estoppel by deed" necessarily bind the parties to the recited consideration of "ten and more dollars" in the deeds. See *Weed v. Weed*, 2008 VT 121, ¶ 13, 185 Vt. 83, 968 A.2d 310 (holding that extrinsic evidence proved that "parties here did not bargain for the recited sum of ten dollars" set forth in deed and that conveyance was without consideration); *Means v. United Fidelity Life Ins. Co.*, 550 S.W.2d 302, 310 (Tex. Civ. App. 1977) ("The principles of estoppel by deed generally do not apply to the recitation of the amount of consideration.").

¶ 20. The trial court also found that there was insufficient evidence to support SMC's claim that the transfers represented "a mere change in the form of ownership by the same owner." SMC had submitted the sworn affidavit of a planning manager employed by the resort since 1994 stating — on personal knowledge — that each transaction "was an inter-corporate transfer between affiliated entities all owned or controlled by AIG for non-monetary consideration" in which MMC "acquired a 99% ownership interest in SPR" and SPR in turn "acquired a 100% ownership interest in SMC." Although the trial court dismissed the affidavit as insuffi-

cient without "supporting documentation," it was not required to prove the facts asserted but only to show that they were genuinely in dispute, and for this purpose it was adequate. See *Johnson v. Harwood*, 2008 VT 4, ¶ 6, 183 Vt. 157, 945 A.2d 875 (in opposing summary judgment, "the adverse party's response, by affidavits or . . . otherwise . . . , must set forth specific facts showing that there is a genuine issue for trial" (quoting V.R.C.P. 56(e)).

¶ 21. The same conclusion applies to SMC's affirmative defenses of equitable estoppel, laches, and unclean hands, which the trial court rejected as factually and legally insufficient. All of these defenses turn on Smalley's alleged failure to assert the restrictive covenant for an unreasonable period of time, thereby prejudicing SMC and rendering the covenant's enforcement inequitable. See *Mann v. Levin*, 2004 VT 100, ¶¶ 26-27, 177 Vt. 261, 861 A.2d 1138 (setting forth elements of laches and equitable estoppel). The affirmative defenses were supported by a sworn affidavit of the resort's planning manager, who stated that Smalley had engaged in numerous meetings with the resort to discuss golf-course issues during its year-long construction and had cooperated with construction personnel, yet failed to raise the restrictive covenant until a year after its completion. This was sufficient to raise a genuine issue of fact as to the fairness of allowing Smalley to assert the restrictive covenant. See *Segerstrom v. Knott*, 149 Vt. 391, 392-93, 543 A.2d 706, 707 (1988) (holding that affidavit attesting to stipulated agreement between parties was sufficient to raise genuine issue of fact concerning affirmative defense).

¶ 22. The motion for summary judgment in this case was filed within four months of the complaint and — as the parties acknowledge — additional discovery remains to be accomplished concerning the exact nature of the 2003 and 2004 transfers, the intent underlying the "sold and conveyed" clause in the deed, SMC's affirmative defenses, and related issues. Accordingly, we conclude that the judgment must be reversed, and the case remanded for further proceedings.[2]

*The judgment is reversed and the case is remanded for further proceedings consistent with the views expressed herein.*

---

[2] Our holding renders it unnecessary to address SMC's claim that the injunctive relief granted exceeds the trial court's equitable authority.