*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

### ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-241

JANUARY TERM, 2015

| | |
|---|---|
| In re D.C. | } APPEALED FROM: |
| | } |
| | } Superior Court, Windham Unit, |
| | } Criminal Division |
| | } |
| | } DOCKET NO. 1385-12-13 Wmcr |
| | |
| | Trial Judge: John P. Wesley |
| | Brian J. Grearson |

In the above-entitled cause, the Clerk will enter:

D.C., who turned sixty in July 2013, appeals an order of hospitalization in the context of a criminal matter in which he was found incompetent to stand trial. We affirm.

On December 4, 2013, based on an incident in which he spit on a police officer, D.C. was charged with violating 13 V.S.A. § 1028(b)(1) (prohibiting persons from "intentionally caus[ing] blood, vomitus, excrement, mucus, saliva, or urine to come in contact with a [law enforcement officer] while the officer is performing a lawful duty"). On January 22, 2014, D.C. was arrested for failing to appear at the arraignment scheduled for the day before. He was jailed after failing to post $500 bail. At his rescheduled arraignment the next day, the superior court, criminal division, ordered that an inpatient evaluation of D.C. be conducted at the Vermont State Hospital. There were no beds available at the hospital, however. Instead, the examination was conducted on February 2 at the correctional facility where D.C. continued to be housed. At the February 21 competency hearing, the court admitted the evaluation, and the parties stipulated to the finding that D.C. was incompetent to stand trial. The court scheduled a commitment hearing for March 7. See 13 V.S.A. § 4820 (providing that when person has, among other things, been found incompetent to stand trial, court shall hold hearing to determine whether person should be committed to custody of commissioner of Department of Mental Health). Meanwhile, D.C. was admitted to Green Mountain Psychiatric Care Center (Green Mountain) on March 3.

At the March 7 commitment hearing, Richard Munson, M.D., a psychiatrist at Green Mountain, was the only testifying witness. At the conclusion of his testimony and the attorneys' arguments, the court found that D.C. had a thought disorder that qualified as a major mental illness. The court also found that, without some form of intervention and compulsory mental-health treatment, D.C. would not be able to take care of himself, and his condition would likely deteriorate. The court concluded, however, that the State had not demonstrated by clear and convincing evidence that hospitalization was the least restrictive alternative for providing D.C. the necessary treatment. Accordingly, the court suspended the proceedings and ordered the State to present evidence on available treatment alternatives.

At the resumed hospitalization hearing on April 11, the State presented the testimony of Rebecca Moore, M.S.W., the director of social work services at Green Mountain. Following her testimony regarding the lack of available alternatives for treating D.C., the court approved a ninety-day order of hospitalization, concluding that the evidence showed that D.C. would be in danger of significant and immediate relapse if he were released without a gradual process of reintegration into the community.[1] In its follow-up hospitalization order, the court determined, based on the evidence and its oral findings and conclusions from the March 7 hearing, that D.C. was a person in need of treatment at all relevant times and continued to be a patient in need of further treatment because "he is mentally ill and as a result poses a danger of harm to himself." The court also determined, based on the evidence and its oral findings and conclusions from the April 11 hearing, that "no less restrictive treatment alternative [other than hospitalization] currently is available for" D.C.

D.C. appeals the court's hospitalization order, arguing that the trial court erred in finding that he met the criteria to be involuntarily hospitalized under 13 V.S.A. § 4822 and 18 V.S.A. § 7623, and in issuing the hospitalization order without sufficient evidence demonstrating that there was no less restrictive treatment available.

We first examine the relevant statutory law. As noted, if a defendant is found to be incompetent to stand trial due to a mental illness as defined in 13 V.S.A. § 4817, the criminal division must hold a hearing for the purpose of determining whether the defendant should be committed to the custody of the commissioner of the Department of Mental Health. 13 V.S.A. § 4820(a)(2). Before involuntarily committing the defendant, the court must find that the defendant "is a person in need of treatment or a patient in need of further treatment as defined in 18 V.S.A. § 7101." 13 V.S.A. § 4822(a). A person in need of treatment is defined as

> a person who has a mental illness and, as a result of that mental illness, his or her capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations is so lessened that he or she poses a danger of harm to himself, to herself, or to others.

18 V.S.A. § 7101(17). A patient in need of further treatment is defined as "a person in need of treatment or "a patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his or her condition will deteriorate and he or she will become a person in need of treatment." Id. § 7101(16).

Mental illness is defined as "a substantial disorder of thought, mood, perception, orientation, or memory, any of which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." Id. § 7101(14). The definition of mental illness explicitly excludes "intellectual disability." Id. A person may be shown to pose a danger to others if the person has inflicted or attempted to inflict bodily harm on another in the past, has placed others in reasonable fear of physical harm through threats or actions, or presents a danger to others in his or her care. Id. § 7107(17)(A). A person may be shown to pose a danger to himself or herself if the person "has threatened or attempted suicide or serious bodily harm" or has behaved in a manner indicating "that he or she is unable, without supervision and the

---

[1] On August 19, another judge in the family division of the superior court granted the State's request that the hospitalization order be continued for an additional ninety days.

assistance of others, to satisfy his or her need for nourishment, personal or medical care, shelter, or self-protection and safety, so that it is probable that death, substantial physical injury, serious mental deterioration, or serious physical debilitation or disease will ensue unless adequate treatment is afforded." Id. § 7107(17)(B).

D.C. first argues on appeal that there was insufficient evidence for the court to find by clear and convincing evidence that he was suffering from a mental illness at the time of the commitment hearing. See State v. Clarke, 145 Vt. 547, 549 (1985) ("The sole issue at the hospitalization hearing is whether the defendant should be hospitalized because of his mental state at the time of that hearing."). D.C. argues that the court erroneously relied on Dr. Munson's testimony, even though Dr. Munson had not recently treated him and testified mostly about his past conditions, and then merely repeated Dr. Munson's conclusion that he suffered from a significant psychiatric disorder, without specifying what the disorder was or making an independent judgment as to the disorder. See State v. Condrick, 144 Vt. 362, 366 (1984) (vacating commitment order where court made no findings in support of its conclusion that defendant had mental illness and made no findings or conclusions on whether defendant posed danger to himself or others); State v. Ladd, 139 Vt. 642, 643 (1981) (vacating commitment order where findings "merely recited the diagnostic label used by the psychiatrist, combined with statutory language . . . establish[ing] the standard to be used in determining whether hospitalization is required"); State v. O'Connell, 136 Vt. 43, 47 (1978) (vacating commitment order because "trial court failed to make a finding of present mental illness").

At the March 7 hearing, Dr. Munson testified that he had treated D.C. for a total of around eight months during two of D.C.'s prior hospitalizations in 2010 and 2011 at the Vermont State Hospital, and that he had been D.C.'s treating psychiatrist at Green Mountain since March 4, the day after he was admitted there. He explained that D.C. has had bipolar disorder (manic depression) and an alcohol-use disorder since his mid-twenties. Dr. Munson testified that D.C. had managed those disorders "quite well" until 2008, when he suffered a stroke that dramatically changed his personality. D.C. began to become unable to control his behavior, and engaged in behaviors such as urinating in public and shouting at people. As a result, D.C. had been involuntarily hospitalized on a number of occasions since 2008. As Dr. Munson explained, D.C. was hospitalized on those occasions because of manic and disorganized thought processes, which resulted in a lack of sleep and an inability to care for himself, plan, or govern his actions. When asked what was the cause of the behaviors that led to D.C.'s current hospitalization, Dr. Munson stated that it was a combination of his longstanding mental disorders and the thought disorder arising from his stroke. Dr. Munson opined that D.C. was in need of treatment when he arrived at Green Mountain and at the time of the hearing because of a disturbance of thought that substantially impaired his judgment. Dr. Munson stated that D.C. had unusually paranoid thoughts about police beating him up, and had trouble organizing his thoughts, planning ahead, and taking care of himself.

At the conclusion of the hearing, the court accepted Dr. Munson's opinion that D.C.'s thought disorder qualified as a major mental illness. The court noted that the disorder resulted in D.C. having paranoid thoughts disconnected with reality, which caused him to engage in unpredictable behavior and impaired his ability to care for himself. We conclude that that Dr. Munson's testimony supported the court's findings, which in turn were adequate to support its conclusion that D.C. suffered from a mental illness, as defined in 18 V.S.A. § 7101(14). See State v. J.S., 174 Vt. 619, 619-20 (2002) (mem.) (stating that on appeal from an order for involuntary commitment, evidence is viewed "in the light most favorable to the State," findings

3

are upheld as long as there is substantial evidence to support them, and commitment order will be affirmed "if the trial court could have reasonably concluded that the required factual predicate was highly probable"). The court did not merely recite, but rather credited, Dr. Munson's testimony. See State v. Sanborn, 155 Vt. 430, 436 (1990) (stating that "the trial court may accept the testimony of specific witnesses . . . and adopt the content of that testimony . . . as the findings of the court," and that this Court "must presume that the [trial] court exercised its independent judgment and weighed the evidence as long as the court doesn't simply recite that specific testimony was given, without showing whether the court believed the testimony in whole or part").

We reject D.C.'s argument that his thought disorder qualifies as an intellectual disability. "Intellectual disability" is defined as "significantly subaverage intellectual functioning existing concurrently with deficits in adaptive behavior that were manifest before 18 years of age." 18 V.S.A. § 8839(3)(A). D.C. was diagnosed with a bipolar disorder in his mid-twenties and had the stroke when he was well into his fifties. Nothing in the statutory definition of mental illness suggests that D.C.'s stroke symptoms, in combination with his bipolar disorder, cannot be considered as evidence of mental illness.

It is true that that insofar as the thought disorder described by Dr. Munson has arisen in part from a stroke, and is not amenable to the kinds of treatments that are effective with respect to other kinds of psychoses, makes this an atypical case. But the trial court's conclusion that D.C. suffers from a thought disorder, and thus a mental illness, is in this case supported by Dr. Munson's testimony. Further, the fact that D.C.'s bipolar disorder is being treated with medication does not undermine the court's finding of mental illness. Even if it can be treated, it is a mental illness under the law, particularly when evaluated in combination with the stroke symptoms, because it can impact D.C.'s thoughts and moods and grossly impair his judgment, his behavior, his capacity to recognize reality, and his ability to meet ordinary demands of life.

We also reject D.C.'s argument that there was insufficient evidence to support the court's finding that he posed a danger to himself without continued hospitalization. The court found that the State had demonstrated by clear and convincing evidence that, given the nature of D.C.'s mental disorder, he was incapable of caring for himself at that time, and his condition would likely deteriorate if he were discharged. This finding is supported by Dr. Munson's testimony that D.C. "pose[d] chiefly a danger to himself right now." Dr. Munson explained that D.C. had spoken to him in the previous few days about "just going out the door" with "no reckoning of the weather, what kind of clothing he would need, [or] where he would go." According to the doctor, he seemed "oblivious [as] to what things he would need to successfully leave the hospital." This was consistent with D.C.'s pattern in the past involving prior hospitalizations, as described by Dr. Munson and later by Ms. Moore at the April 11 hearing. Dr. Munson described instances in which D.C. would leave his home and go someplace where he wound up sleeping on the ground or wandering around aimlessly. He stated that D.C. would not be able to look after his basic needs such as shelter, food, and warmth, and could even pose a risk to others if he was unable to restrain himself after hearing some innocent comment made to him by another person.

Similarly, at the April 11 hearing, Ms. Moore described D.C.'s cycle of hospital stays and discharges that resulted in D.C. quickly regressing and ending up in unintended places unable to care for himself. She described a January 17, 2014 incident in which D.C. was picked up less than twenty-four hours after he was released from the Brattleboro Retreat. He was found in an ATM lobby with no outerwear and covered in his own feces. The court found that although

4

D.C.'s mental condition had improved since he had been hospitalized, the State had proved that his treatment needed to continue for a significant period of time with supportive services and that a gradual step-down process was required before D.C. could be safely placed in a less restrictive environment. The evidence supports these findings.

D.C. also argues that the evidence did not support the court's finding that he was at risk of harm as a result of his mental illness. According to D.C., Dr. Munson's testimony established that the 2008 stroke, not the underlying bipolar disorder, was the cause of his behavior. Further, in his view, Dr. Munson acknowledged that the brain damage resulting from the stroke was not susceptible to mental health treatment. We find these arguments unavailing. As noted, Dr. Munson testified that the thought disorder and behaviors that led to D.C.'s arrest and hospitalizations resulted from a combination of his bipolar disorder and the stroke. In short, the evidence supported the court's finding that D.C. was at risk to harm himself as the result of his mental illness.

Finally, D.C. argues that the evidence was insufficient for the court to conclude that no less restrictive treatment was available. We disagree, although this presents a very close question. The statutory civil-commitment scheme requires the court, prior to ordering a course of treatment, to determine whether an "available program of treatment" other than hospitalization is "available."[2] 18 V.S.A. § 7617(c). Here, Dr. Munson acknowledged that commitment to a psychiatric hospital is "kind of a heavy-handed way of preventing him from wandering out into the cold weather without regard for what he needs," and the court recognized that this placement was a placeholder for a less restrictive and more suitable, but apparently yet-unavailable situation. For that reason, the court scheduled a second hearing specifically to take evidence on State's efforts to identify a less-restrictive alternative. At the later hearing, Ms. Moore testified about the lack of openings at two secure residential-recovery facilities, and opined that D.C. could not be safely discharged to any less-restrictive type of facility. When asked if there was any environment less restrictive than Green Mountain that was available to treat D.C., she answered in the negative. D.C. did not present any contrary evidence that an appropriate, less-restrictive alternative was available. Ms. Moore's testimony, which the court described as "thorough, careful [and] indicating a caring professional," as well as Dr. Munson's testimony, supported the court's finding that no less restrictive treatment was available.

---

[2] At a criminal commitment proceeding under Title 13, the court is not required to make findings on the availability of treatment alternatives. J.S., 174 Vt. at 622. Nevertheless, the court in this case suspended the criminal-commitment hearing for three weeks and ordered the State to submit additional evidence on alternative placements. The State agreed to do so without objection, and in fact presented the additional evidence at the later hearing. At the conclusion of that hearing, the court acknowledged that the State was not required to present evidence on alternative placements, but stated that it was appropriate to insist on such evidence in this case not only because the State did not object to doing so, but also because of the unusual posture of the case and the fact that the defendant had been jailed for a significant period of time for lack of appropriate placement in a place where he could be treated. Given its acquiescence to this procedure, the State cannot now complain that it need not have presented evidence of potential alternative placements. See Gardner v. Jefferys, 2005 VT 56, ¶ 14, 178 Vt. 594 (mem.) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (internal quotation marks omitted).

This is a close case because the evidence supports a conclusion that limits on available State resources, rather than the treatment needs arising from D.C.'s condition, are the primary driver of the court's conclusion. Nobody here suggests that D.C. needs or will substantially benefit from the kind of intensive treatment provided in a psychiatric hospital. He needs the kind of help with daily living and protection against his own impulses that a far less-intrusive residential-care facility can provide. Short-term placement in a psychiatric hospital may provide a humane bridge for a patient with a thought disorder whose primary needs arise from symptoms of dementia and an inability to provide self-care where there is no immediate availability of more appropriate resources. But it is not an acceptable long-term solution and is, as Dr. Munson admitted, a kind of heavy-handed way of preventing D.C. from harming himself.[3] Where the circumstances are such that hospitalization is being ordered because it is the only acceptable available alternative, the court may review the order of hospitalization as frequently as is necessary to insure that due diligence is used to make a less-restrictive alternative available without delay.[4]

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

---

[3] D.C. has not raised and we do not address any constitutional claims.

[4] One alternative that needs to be explored is appointment of a guardian. If necessary, the public guardian, see 14 V.S.A. § 3092(a), can seek an appropriate living arrangement consistent with D.C.'s needs and manage financing and care decisions.