# Carrie Patch v. Springfield School District

[989 A.2d 500]

No. 08-366

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed November 20, 2009

*Amanda T. Rundle* of *Dakin & Benelli, P.C.*, Chester, for Plaintiff-Appellant.

*J. Christopher Callahan* and *Brendan P. Donahue* of *Brady & Callahan, P.C.*, Springfield, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiff appeals from the superior court's order allowing defendant Springfield School District to construct a parking lot on a portion of its land located adjacent to plaintiff's property. Plaintiff argued below that restrictive covenants in the district's chain of title limit use of the land to dwelling purposes and therefore preclude construction of the planned parking lot. The superior court held that the land at issue was not subject to restrictive covenants and, even if it was, the restrictive covenants had been rendered unenforceable by acquiescence, prescription, and changed circumstances. On appeal, plaintiff argues that the court erred in concluding, as a matter of law, that: (1) the district's land was not subject to any restrictive covenants; (2) Vermont does not apply the doctrine of implied negative covenants in a case such as this; (3) even if there were restrictive covenants, they had been extinguished by acquiescence, prescription, or a change in the neighborhood's character so extreme as to render any restrictive covenants unenforceable. We affirm as to the first two grounds for the trial court's decision, and it is therefore unnecessary to reach the third issue.

¶ 2. Both plaintiff's and the district's properties were once part of land owned by Sunmount/Douglass Real Estate Corporation (Sunmount) and included in Sunmount's 1928 plan for a residential subdivision containing over 100 lots. The only recorded instrument relating to the Sunmount subdivision is a 1928 plat map in the Town of Springfield land records showing the land divided into lots. Sunmount sold the first of these lots on July 26, 1929.

Although the first deed contained no reference to restrictive covenants, the deeds for each of Sunmount's sixteen subsequent conveyances — including the deed to the property eventually purchased by plaintiff — did contain covenants, which, among other things, restricted development to dwelling purposes.[1]

¶ 3. On September 27, 1938, Sunmount conveyed its remaining unsold lots back to Albert W. LaFountain and William D. Woolson, the parties from whom it originally purchased the land. This deed provided that the conveyance was subject to:

> any building restrictions and conditions . . . which the grantor . . . may be legally bound to insert in any subsequent conveyances of lots or parcels because of any agreement, express or implied, with grantees of lots or parcels which have been conveyed heretofore, that the lots were conveyed under a general plan or scheme and that all subsequent deeds are to contain the same restrictions.

In other words, the deed imposed restrictions that may have existed in agreements between Sunmount and previous purchasers on subsequent conveyances. From 1938 though 1945, Woolson conveyed former Sunmount lots under approximately eleven deeds.[2] All but one of these deeds contained the same covenants found in the Sunmount deeds, including the covenant restricting use of the property to dwelling purposes.

¶ 4. In July 1946, Woolson's estate conveyed a twelve-acre parcel made up of almost two-thirds of the original Sunmount lots to the Town of Springfield.[3] Even though the parcel is described in the deed by reference to lot numbers from the 1928 Sunmount

---

[1] The covenants contained in the Sunmount deeds provide, in pertinent part, as follows:

1. That no building shall be erected on said premises excepting a dwelling house and additions thereto, and a garage. . . .

2. That the said premises shall not be used otherwise than for dwelling purposes.

[2] LaFountain appears as a co-grantor with Woolson on only one deed in the record. LaFountain apparently quitclaimed his share of the property to Woolson in 1940.

[3] The superior court stated that it could not determine the exact number of lots in the originally proposed subdivision on the record before it, and at times the court refers to 124 lots, but the map submitted into evidence shows 107 lots and

subdivision map, the land was conveyed as a single parcel, and the property has historically been treated that way by the district and by the Town. None of the lots conveyed to the district had been part of any conveyance by Sunmount prior to their sale to LaFountain and Woolson, nor had they been previously sold by LaFountain and Woolson to any other owners. Thus, the district's chain of title contains none of the deeds that explicitly restrict use of the land to dwelling purposes. Additionally, in the Woolson deed to the district, there is no covenant explicitly restricting use of the land; instead, the deed states that the conveyance is subject to any restrictions that exist on the land, referring specifically to the Sunmount-LaFountain/Woolson conveyance that "was made subject to such conditions and restrictions, *if any there are which are legally binding.*" (Emphasis added.)

¶ 5. After multiple public meetings and a lengthy public voting process in the late 1940s, the district built and opened a school, now known as the Elm Hill School, on the property it purchased from Woolson's estate. Since then, the district has continuously operated a school on the property.

¶ 6. Plaintiff grew up in the Town of Springfield and bought her property in August 2002, knowing that the district's parcel bordered her property. As previously noted, plaintiff's property is one of the properties Sunmount originally sold subject to the restrictive covenant limiting use of the property to dwelling purposes. At the time of her purchase, the portion of the district's land that abutted plaintiff's property was undeveloped woodland, used by school programs for nature study and recreation. But after plaintiff purchased her land, the district developed a plan for a school rehabilitation project that included a new twenty-three-space parking lot in the area where its parcel meets plaintiff's property. In early 2007, after learning of the planned parking lot, plaintiff took part in the zoning board proceedings regarding the district's plans. She argued before the board that the parking lot was precluded by restrictive covenants in the district's chain of title. Despite plaintiff's objections, the zoning board granted the district a permit, and the district proceeded with construction. When plaintiff filed this lawsuit in the superior court, she requested, and the court granted, a preliminary injunction which

---

the district purchased seventy of those. Whether there were 107 or 124 lots, the district's purchase comprised over half of the land owned by Sunmount.

halted parking lot construction. However, after a bench trial on the merits, the court ruled in favor of the district.

¶ 7. The dispositive question in this case, as the trial court noted, is whether the district is subject to the restrictive covenants that are explicit in the deeds of most of the properties conveyed by Sunmount and Woolson. The deeds in the district's chain of title do not explicitly state a restrictive covenant limiting the use of the land to dwelling purposes. Nonetheless, plaintiff reasons that the district is subject to the same restrictive covenants that govern her property because, she argues, Sunmount created a general-plan development on the land described in the subdivision plat map recorded in 1928. If such a general-plan development exists, plaintiff asserts it is governed by the set of restrictive covenants contained in most of the deeds from Sunmount to the first seventeen purchasers. Alternatively, plaintiff argues that the deed from Sunmount to LaFountain and Woolson, and the deed from Woolson's estate to the district, incorporated by reference the restrictive covenants contained in the deeds previously sold by Sunmount and Woolson. Finally, in the event we affirm the trial court's holdings regarding the lack of a general-plan development and incorporation by reference, plaintiff urges us to apply the doctrine of reciprocal negative easements here to hold that the district is bound by the restrictive covenants contained in plaintiff's chain of title.

■ ■ ¶ 8. Covenants are "agreement[s] or promise[s] of two or more parties that something is done, will be done, or will not be done," and are characterized by the type of burden they impose: an affirmative covenant calls for the covenanter to perform an act, while a negative covenant requires the covenanter to refrain from performing one. 9 R. Powell, Powell on Real Property § 60.01[2] (M. Wolf ed. 2007); see also Restatement (Third) of Property: Servitudes § 1.3 cmt. e (2000). Negative covenants that "limit[] the uses that can be made by the owner or occupier of land" are also called restrictive covenants. *Id.* We have recognized that restrictive covenants can be established via a common development scheme for a general-plan development, *Creed v. Clogston*, 2004 VT 34, ¶¶ 20-21, 176 Vt. 436, 852 A.2d 577, and by including restrictions in a deed, which may be accomplished by reference to other deeds, *Albright v. Fish*, 136 Vt. 387, 394, 394 A.2d 1117, 1121 (1978); see also *Leon N. Weiner & Assocs. v. Krapf*, 623 A.2d 1085, 1088 (Del. 1993) (recognizing two methods of establishing a

restrictive covenant: (1) through "explicit written language . . . in the deed . . . or another recorded document" and (2) "by implication . . . usually ascertained from a common plan of development"). Here, plaintiff fails to demonstrate that a restrictive covenant burdening the district's land was created in either of these ways, and under the facts of this case, we reject the only other basis plaintiff offers for holding that restrictive covenants govern the district's use of its land, namely, the doctrine of reciprocal negative easements.

¶ 9. The premise of plaintiff's general plan argument is that the plat map Sunmount filed in 1928 and the restrictive covenants contained in almost all of the Sunmount conveyances created a general-plan development. We most recently considered general-plan developments in *Creed v. Clogston*, a case in which neighbors sued to prevent a manufactured home from being installed on a lot in their neighborhood. 2004 VT 34. The neighbors' suit relied in large part on a restrictive covenant, contained in the deeds to eleven lots in a twenty-lot subdivision, which prohibited the installation of mobile homes. The trial court concluded that the mobile-home covenant, in conjunction with a covenant contained in the deeds to every lot in the subdivision setting a minimum cost of construction for dwellings built on the lots, made it evident that the covenant drafters "intended to create a neighborhood that contained only site-built homes." *Creed*, 2004 VT 34, ¶ 10. We rejected that conclusion, in part, because the record did not support holding that the neighborhood was a general-plan development at all, let alone one governed by a requirement that all homes be built on-site. *Id.* ¶¶ 20-21.

■ ¶ 10. In *Creed*, we defined a general-plan development as a " 'real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude imposed to effectuate a plan of land-use controls for the benefit of the property owners in the development or neighborhood.' " *Id.* ¶ 20 (quoting Restatement (Third) of Property: Servitudes § 1.7). We further noted that general-plan developments "are generally created by developers who impose the servitudes before any lots or units are sold, but they may also be created by agreement among existing property owners." *Id.* (quotation omitted). The land at issue in *Creed* was an eleven-acre parcel that was first sold to developers subject to certain covenants, including the minimum-cost-of-construction covenant, but not the mobile-home covenant.

*Id.* ¶ 3. The developers recorded a twenty-lot subdivision plat of the parcel in the town land records and conveyed nine lots by deeds that all contained the same covenants that the deed to the full eleven-acre parcel contained. *Id.* ¶ 4. After making these sales, the developers conveyed the remaining acreage in the subdivision to a realty company that proceeded to sell the remaining eleven lots. The realty company deeds incorporated by reference the covenants contained in the developers' deeds, plus they contained an additional set of covenants, one of which forbade the installation of mobile homes for residential purposes. *Id.* ¶¶ 2, 5.

¶ 11. We rejected the trial court's conclusion that a neighborhood-wide restriction on mobile homes existed because the subdivision as a whole could not be treated as a general-plan development. *Id.* ¶ 19. In declining to adopt the trial court's construction of the mobile-home covenant, our decision questioned the possibility that any kind of general plan governed the subdivision where the specific covenant at issue was included in the deeds to only the later-sold lots. The *Creed* neighborhood was not a general-plan development, we explained, because "there was no declaration of covenants imposed before any lots within [the] neighborhood were sold, nor was a subsequent servitude created by existing property owners." *Id.* ¶ 21. Absent a predicate declaration of covenants or a subsequent agreement by the lot-holders, the common mobile home covenants were not sufficient to infer a general-plan development. Therefore, the appropriate inquiry was the intent of the parties as expressed by the plain language of the deed. *Id.* ¶ 22.

■ ■ ¶ 12. In light of our decision in *Creed*, the facts here do not permit the conclusion that the Sunmount subdivision was a general-plan development. Neither the subdivision plat, nor the first deed, contained any reference to restrictive covenants; only the later deeds contained such reference. The mere existence of a recorded plat map does not constitute the creation of a general-plan development because the map simply lays out the location of lots within a certain area of land; it gives no indication of any restrictions that might govern those lots. Covenants in individual deeds cannot constitute a "declaration" of covenants — as explained in *Creed* — and even more importantly in this case, the first lot sold in the Sunmount subdivision contained no covenants at all. These factors, taken together, compel the conclusion that the Sunmount subdivision is not a general-plan development.

¶ 13. Plaintiff argues that, notwithstanding *Creed*, Sunmount created a general-plan development here because the trial court correctly found that Sunmount intended to create a general-plan development. Plaintiff asserts that her general plan argument is bolstered by language in the deed from Sunmount to LaFountain and Woolson stating that the conveyance was made "subject to any building restrictions and conditions, [which Sunmount] . . . may be legally bound to insert in any subsequent conveyances . . . because of any agreement, express or implied, with grantees of any lots or parcels . . . [previously] conveyed, . . . that the lots were conveyed under a general plan or scheme." Plaintiff interprets this language as evidence that Sunmount intended to create a general-plan development and that Sunmount intended that LaFountain and Woolson would be bound to include in all land sales they made — including the sale to the district — the same restrictive covenants Sunmount used in previous conveyances.

¶ 14. Intent may be a piece of the general plan analysis, but as *Creed* clarified, intent alone does not create a general-plan development. Plaintiff argues that *Rogers v. Watson*, 156 Vt. 483, 488, 594 A.2d 409, 412 (1991), and *Albright v. Fish*, 136 Vt. at 394, 394 A.2d at 1121, establish a rule that intent to create a common scheme for subdivided land is sufficient to establish a general-plan development. Neither *Rogers* nor *Albright*, however, stand for that proposition or even deal with general-plan developments. At issue in those two cases was whether restrictive covenants in the chain of title to particular plots of land ran with the land, and more specifically, whether there was sufficient evidence of the parties' intent that the restrictions ran with the land. In *Rogers*, we stated that inclusion of a restriction in most deeds from the common grantor "show[ed] an intent to create a common development scheme." *Rogers*, 156 Vt. at 488, 594 A.2d at 412. That observation provided support for our holding that the grantor intended the burden of the deed restriction to run with the land. *Id.* We did not rely on the observation to make any conclusion regarding the creation of a general-plan development, and the issue of general-plan developments was never raised or discussed in the case. *Id.* Similarly, in *Albright*, we held that a covenant contained in a deed was intended to run with the land, in part, because two of three lots conveyed by a common grantor contained the covenant, and the third lot contained the covenant in its chain of title, "evidencing a common scheme as to the property." *Albright*, 136 Vt. at

394, 394 A.2d at 1121. Again, *Albright* did not address whether a general-plan development was created on the lots at issue; rather, it merely addressed whether the parties intended for the covenant to run with the land. Therefore, it has no bearing on whether intent to create a common scheme is sufficient to create a general-plan development.

¶ 15. Analysis of the cases cited by plaintiff and of our *Creed* holding demonstrates that Sunmount's intent to create a common development scheme has little, if any, bearing on whether it actually created one where express language is lacking. Intent may be the determinative inquiry for general-plan development in some jurisdictions, but it is not so in Vermont. Cf. *Corner v. Mills*, 650 N.E.2d 712, 715-16 (Ind. Ct. App. 1995). Here, as in *Creed*, the filing of a subdivision plat map in the land records, inclusion of the same restrictive covenants in many of the deeds to the subdivision lots, and evidence of intent to create a common-plan development — derived from the fact that all but a handful of the lots were expressly subject to the covenants — does not compel us to conclude a general-plan development exists. The missing ingredient is a declaration of covenants imposed before the first lot was sold, or a subsequent agreement among all lot owners to impose a set of covenants on the involved land.[4]

¶ 16. Plaintiff's second argument is that, even if the former Sunmount land is not a general-plan development, the deeds in the district's chain of title incorporate by reference the restrictive covenants contained in the Sunmount deeds. Incorporation of a deed by reference is "as effective as if the deed referred to had been copied into the deed making the reference." *Tallarico v Brett*, 137 Vt. 52, 60, 400 A.2d 959, 964 (1979). Contrary to plaintiff's contention, this does not mean that the restrictive covenants contained in the Sunmount deeds were incorporated by reference into the district's deed. Plaintiff's reliance on *Tallarico* and *Welch v. Barrows*, 125 Vt. 500, 218 A.2d 698 (1966), on this point is misplaced. In those cases, the deeds at issue incorporated by reference, without reservation or conditions, other deeds that

---

[4] In her brief, plaintiff expresses concern that this rule would make restrictive covenants contained in deeds unenforceable unless the deed grantor files a separate declaration of covenants. This concern is unfounded. Our requirements for general-plan developments have no bearing on the enforceability of covenants that are contained in deeds.

clearly granted easements or contained other restrictions. See *Tallarico*, 137 Vt. at 60, 400 A.2d at 964 (holding that the plaintiff's deed clearly and unconditionally incorporated by reference the defendant's deed, which granted the defendant a right of way over the plaintiff's land); *Welch*, 125 Vt. at 503, 218 A.2d at 701-02 (upholding restrictive covenant where deed incorporated by reference rights conveyed via deed to prior purchasers in same small subdivision where it specified, without reservation, that the conveyance included "every and all other rights and privileges as have been granted by [grantor] to former purchasers" in the subdivision). By contrast, the deeds at issue in this case make conditional reference to the restrictions in the earlier Sunmount deeds, stating merely that any conveyances from LaFountain and Woolson to subsequent purchasers would be subject to the Sunmount restrictions *only if* the Sunmount restrictions created a legally binding obligation.

¶ 17. The Sunmount deed to LaFountain and Woolson, quoted above, contains the following conditionally phrased provision regarding use restrictions:

> This conveyance is subject to any building restrictions and conditions . . . which the grantor, its successors or assigns, *may be legally bound to insert in any subsequent conveyances of lots or parcels because of any agreement,* express or implied, with grantees of lots or parcels which have been conveyed heretofore, *that the lots were conveyed under a general plan or scheme and that all subsequent deeds are to contain the same restrictions.* This conveyance is subject to such conditions and restrictions, *if there are any,* which are legally binding.

(Emphasis added.) Under these terms, the land conveyed to LaFountain and Woolson was subject to restrictive covenants only if Sunmount's prior conveyances created an agreement with their grantees that the lots had been conveyed under a general plan, thereby making all subsequent conveyances legally bound by the same conditions and restrictions. As earlier explained, under *Creed*, there was no enforceable agreement absent a filing to that effect.

¶ 18. Similarly, the deed by which Woolson's estate conveyed the land to the school district contains the following conditional provision related to use restrictions:

> This conveyance is made subject to any building restrictions and/or conditions which exist as to the land hereby conveyed, reference being had to the warranty deed from [Sunmount to LaFountain and Woolson], *which conveyance was made subject to such conditions and restrictions, if any there are which are legally binding.*

(Emphasis added.) Again, this deed merely states that the district is subject to any restrictions that may have applied to the land by virtue of the conveyance from Sunmount to LaFountain and Woolson. Neither of these deeds unequivocally or unconditionally states that the Sunmount deeds, or the actual restrictions contained in those deeds, are incorporated by reference. Instead, the deeds state that the restrictions are incorporated only if Sunmount's earlier conveyances independently created a general-plan development, which would have required all later conveyances to contain the same use restrictions. Because we conclude that no such development was created, the deeds in the district's chain of title do not incorporate by reference the restrictive covenants found in the other deeds conveyed by Sunmount and Woolson.

¶ 19. We turn finally to plaintiff's argument that we should apply the doctrine of reciprocal negative easements here. While there are other situations in which courts recognize and enforce implied covenants, the type of implied covenant that plaintiff argues we should apply in this case — often called a "reciprocal negative easement" or an "implied reciprocal servitude," Powell, § 60.03[1], at 60-21 to 60-22 — would exist only if a general plan for the Sunmount subdivision existed.[5] For, where

---

[5] The doctrine of reciprocal negative easements has not been adopted in Vermont. *Fassler v. Okemo Mountain, Inc.*, 148 Vt. 538, 542, 536 A.2d 930, 932 (1987) ("[R]estrictions will not be extended by implication to include anything not clearly expressed, and doubts must be resolved in favor of the free use of land." (quotation omitted)). Reciprocal negative easements arise where "the owner of two or more [appurtenant] lots . . . sells one with restrictions of benefit to the land retained." *Sanborn v. McLean*, 206 N.W. 496, 497 (1925). The rule requires that during the period of restraint the owner of the retained property is mutually restrained by the conditions. *Id.* To ensure the reciprocal negative easement "exists with vigor sufficient to work its ends," it must be imposed with the first deed conveyed, never

a court can find a common owner's intent to restrict or require particular use of the first and subsequent lots of a subdivided parcel for the benefit of the property owners in the neighborhood, a general plan exists as a matter of law. See Restatement (Third) of Property: Servitudes § 1.7. Plaintiff cites *Chase v. Burrell*, 474 A.2d 180, 181 (Me. 1984), to describe the general conditions under which the doctrine is applied:

> Although the criteria for application of the doctrine vary somewhat among different jurisdictions, generally, the doctrine is applied when: (1) a common owner subdivides property into a number of lots for sale; (2) *the common owner has a "general scheme of development" for the property as a whole*, in which the use of the property will be restricted; (3) the vast majority of subdivided lots contain restrictive covenants which reflect the general scheme; (4) the property against which application of an implied covenant is sought is part of the general scheme of development; and (5) the purchaser of the lot in question has notice, actual or constructive, of the restriction.

(Emphasis added.) This same type of implied covenant is described in the Restatement (Third) of Property: Servitudes § 2.14 as resulting from the conveyance of land pursuant to a general plan. Further, case law in other jurisdictions identifies a general-plan development as a prerequisite to the enforcement of implied restrictive covenants. See, e.g., *Roper v. Camuso*, 829 A.2d 589, 602 (Md. 2003).

¶ 20. *Creed* precludes an inference that a general-plan development exists for the former Sunmount subdivision property

retroactively. *Id.* This Court has implied that a restrictive covenant applied with a general-plan development describes the same rights described by reciprocal negative easement, negative easement, implied negative covenant, and equitable servitude. *Madkour v. Zoltak*, 2007 VT 14, ¶ 21, 181 Vt. 347, 924 A.2d 11 (equitable servitude, restrictive covenant and reciprocal covenant used interchangeably); *Albright*, 136 Vt. at 394, 394 A.2d at 1121 (restrictive covenants create reciprocal rights in property owners); see also Restatement (Third) of Property: Servitudes § 1.2 cmt. h (recognition of negative easements, now generally limited to the right to access light and air or a scenic view, has become so restricted in modern American law as to lose its utility). Therefore we decline to adopt the term reciprocal negative easements, as plaintiff urges, or to use alternative terms in place of the term restrictive covenant.

absent a filed declaration of covenants or the owners' agreement. Most of plaintiff's argument urging us to apply the doctrine of reciprocal negative easements to this case describes case law in jurisdictions with more relaxed requirements for establishing a general-plan development. In those jurisdictions, courts recognize general-plan developments on evidence other than the declaration of covenants that *Creed* requires, and, therefore, enforce restrictions in situations that do not meet our standard. See, e.g., *Stark v. Robar*, 63 N.W.2d 606, 608 (Mich. 1954) (enforcing implied covenants on lots in a subdivision that were originally deeded without any restrictions because restrictive covenants in most of deeds to other lots in subdivision, and language in land contracts, were sufficient to evidence a uniform plan); see also *Joslin v. Pine River Dev. Corp.*, 367 A.2d 599, 601 (N.H. 1976) (preventing group of landowners from using waterfront lot recreational purposes because where deeds to all lots in a lakeside subdivision contained covenants restricting certain building types and imposed building requirements, a general scheme for residential use existed). Rather than subject an unknown number of subdivisions to restrictive covenants neither agreed to by all owners, nor explicitly imposed by common grantors, we maintain the course set in *Creed*. Purchasers interested in a general-plan development may either establish such a plan in the common declaration of covenants or seek out the agreement of their neighbors.

¶ 21. Because we conclude that the district's property was never subject to any restrictive covenants, we need not reach the issues of whether any such covenants have been rendered unenforceable by acquiescence, prescription, changed circumstances, or any other means of modification or extinguishment.

*Affirmed.*