Filed 05/22/25

VERMONT SUPERIOR COURT

Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 23-CV-02924

| Mark Wilson et al v. Gegham Artsruni et al |
| --- |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this land-use dispute, Plaintiffs Mark Wilson and Carrie Wilson request a declaratory judgment establishing that a particular lot may not be developed and an injunction prohibiting building and improvement on that lot. Defendants Gegham Artsruni, Ani Adzhemyan, Tigran Avetisyan, and Sona Antonyan move for summary judgment, and Plaintiffs cross-move for summary judgment.

### Facts

The following facts are undisputed unless otherwise noted. Deux Mondes, Inc. created the Cricket Hill Development ("Cricket Hill") and recorded a Declaration of Protective Covenants, Restrictions and Reservations ("Covenants," "Declaration," or "Declaration of Covenants") in the Town of Killington land records. Exhs. 1 and A. The Declaration defines Cricket Hill as a residential area subdivided into "lots, streets and roads" as shown on a plan on file or to be filed in the land records. *Id.* Three plans depicting Cricket Hill were recorded, depicting Cricket Hill as a residential subdivision. Exh B. The Declaration expressly states that the lots are to be subject to the protective covenants, restrictions, and reservations to benefit all present and future owners, and are set forth in the Declaration so that they may be incorporated by reference in future conveyances. Exhs. 1 and A. The Declaration states that its covenants, restrictions, and reservations are "binding on all lots and the owners thereof in Cricket Hill as if set forth in detail in each conveyance," and shall run with the land. *Id.* Although the three plans appear to have been submitted after the Declaration, there is no evidence that a majority of lot owners objected to them. Pursuant to the Declaration, any owner of any lot in Cricket Hill may enforce the provisions of the Covenants against another owner.

Deux Mondes applied for and received an Act 250 permit for Cricket Hill in 1973. Deux Mondes also applied for and received a subdivision permit in 1973. Plaintiffs acquired Lot 19 in Cricket Hill in 2020. Defendants purchased Lot 18 in Cricket Hill in 2020. Defendants assert that they acquired Lot 20 at the same time, but the exhibit they submitted in support of this assertion, Exh. D, includes a description of that second lot in

Schedule A as "known as the 'community property lot' of the Deux Mondes Subdivision" and not as "Lot 20" (hereinafter, "Community Property").[1]  The Covenants refer to surveys that label the property in question as "community property," not as Lot 20.  *See* Exhs. B and 2.  All three plans label the property in question as "community property," and the third plan depicts Lot 20 as a separate lot that is a different lot than the "community property" and unrelated to this action.  Exh. B at 3.  The Community Property has not been subdivided since its creation and is approximately 3.06 acres in size.

The Covenants provide that "[n]one of the lands affected by the protective covenants shall be subdivided into other than a minimum of 4 acre parcel."  Exh. A, § 1(a).  Defendants assert that the Covenants do not restrict development on the Community Property.  Plaintiffs contend that the Covenants incorporate the recorded development plans, which in turn depict the Community Property as under 4 acres (and thus, undevelopable), and label the Community Property as "community property" rather than numerically, implying that the lot is to be left undeveloped and for the benefit of Cricket Hill as a whole.

Plaintiffs assert, yet fail to establish with admissible evidence that there is an absence of disputed fact, that ever since Cricket Hill was developed, the residents understood that they were allowed to use the Community Property, and that the residents always wanted it to remain open and undeveloped for the benefit of the entire community.  It is undisputed that some residents of Cricket Hill have used the Community Property for riding three- and four-wheelers, fishing, walking, relaxing, enjoying scenery, watching wildlife, having bonfire, setting up tents, and playing at the ponds.  Plaintiffs have not established based on evidence that residents of Cricket Hill on the whole understood that they had a right to use the Community Property or if they did understand that they had a right to use it, what the scope of that right entailed.

Lot 18 is adjacent to the Community Property along the eastern border of the Community Property.  Exh. B.  The Covenants provide that "[a]n owner of adjoining lots may combine his parcels so as to disregard the set-back requirements regarding these lot lines which divide his separate premises."  Exh. A, § 1(b).

The parties agree that Deux Mondes no longer exists.  The Community Property was sold at a tax sale to Edward Godnick and Gilbert Godnick in 1987.  The sale price was

---

[1] Defendants refer to the lot in question, throughout their filings, as Lot 20.  The Court does not follow this designation, since it is apparent that the lot in question is labeled "community property" in the site plans to which the Declaration refers, as well as later deeds, whereas Lot 20 refers to a different lot entirely on the recorded plans.  Defendants appear to take their notion that the lot in question is Lot 20 from a later map related to wastewater permitting, and correspondence with another resident, that the Court cannot identify, based on the undisputed material facts, as meaningfully authorized to redesignate the Community Property lot as Lot 20, especially when it appears that Lot 20 is a lot unrelated to this litigation.

$455.57, which was the equivalent of $1,263.00 in November 2024. The tax sale deed incorporates a description from one of the recorded plans that identifies the lot as "community property." The Godnicks never developed the lot. E&K Asset Management LLC ("E&K") acquired the Godnicks's respected interests in the lot via a trustees deed in 1999 and quitclaim deed in 2004. Exhs. H and I. E&K deeded the lot to Edwin J. Fowler in 2004. Exh. J.

Fowler applied for and obtained permits for Lot 18 and the Community Property. In 2008, he acquired a wastewater permit. Exh. K. The permit allowed for wastewater disposal systems for the volume of wastewater that would be produced by maximum four-bedroom single-family dwellings on Lot 18 and the Community Property. *Id.* The site plan approved by the permit shows a four-bedroom house on each of Lot 18 and a lot labeled "Lot #20." Exh. L.

In 2008, District Environmental Commission No. 1 granted Fowler an Act 250 permit amendment authorizing him to combine Lot 18 and the Community Property "into one larger Lot #18." Exh. M. Fowler constructed three ponds on Lots 18 and the Community Property, then sought permission and received another Act 250 permit amendment for the three ponds. The Ponds Site Plan that Fowler submitted to the District Environmental Commission No. 1 depicts the largest of the three ponds almost entirely on the Community Property. Despite having constructed the three ponds, Fowler did not begin construction on the combined-lots project within three years of obtaining the Act 250 Amendment, and the District Environmental Commission No. 1 deemed the Fowler Act 250 amendment to have been abandoned. Exh. P.

Fowler never developed the Community Property for unequivocally private purposes, and it is a disputed fact whether the ponds, despite being Fowler's initiative, were developed for community use. During Fowler's ownership of the Community Property, at least one other resident of Cricket Hill used it for fishing, and Fowler acknowledged that residents could use the lot. When Fowler proposed building a home on the Community Property, another resident pointed out that the Covenants did not allow homes on lots smaller than four acres. It is disputed whether the residents successfully discouraged Fowler from further developing the lot and if so, for which reasons, but it is undisputed that Fowler did not develop the lot in a manner that clearly indicates that the residents, or Fowler, recognized that it could be used for private purposes.

Defendants hired Stephen Pro of SepticPro LLC to design a septic system on their adjacent lots. Pro designed a system for a combined single lot, in which the system was located entirely on the Community Property. At Defendants' request, Pro visited the lots to consider whether he could design a septic system for a smaller house located entirely on Lot 18. In Pro's opinion, a septic system for a house on Lot 18 cannot be situated within Lot 18. Defendants lament that if they cannot build a septic system on the Community

Property, their entire $155,000 investment will have been lost, and they will be left with tax responsibilities for the lots, which are taxed at a residential rate. The parties dispute whether the relatively low price for which the Community Property was conveyed over the years is indicative of acknowledgement that its development was restricted.

Defendants admit that Gegham Artsruni received a copy of the Declaration prior to purchasing the Community Property. Plaintiffs assert that Fowler attempted to get the residents of Cricket Hill to amend the Covenants to allow homes to be built on lots with a minimum of three acres.

## Discussion

The Court denied Defendants' motion to dismiss on October 16, 2023. In that decision, the Court noted that "[t]he issue presented by this case is whether the general-plan servitudes include, in addition to those specifically stated in the Declaration, one that may be implied to prohibit individual private development on the 'community property' lot." *Wilson v. Artsruni*, No. 23-CV-02924, slip op. at 3 (Vt. Super. Ct. Oct. 16, 2023) (Teachout, J.). The first basis from which such a servitude might be implied is reference to it in a related creation document such as the survey of Cricket Hill. *Id.* The second basis is agreement among owners. *Id.* at 4.

Summary judgment is appropriate if the evidence in the record, referred to in the statements required by Vt. R. Civ. P. 56(c), shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Vt. R. Civ. P. 56(a); *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994) (summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial). The Court derives the undisputed facts from the parties' statements of fact and the supporting documents. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 29, 175 Vt. 413. A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact. Instead, it must come forward with deposition excerpts, affidavits, or other evidence to establish such a dispute. *Murray v. White*, 155 Vt. 621, 628 (1991). Where, as here, there are cross-motions for summary judgment, the parties opposing summary judgment "are entitled to the benefit of all reasonable doubts and inferences." *Montgomery v. Devoid*, 2006 VT 127, ¶ 9, 181 Vt. 154. In order to be entitled to summary judgment, Defendants must show that Plaintiffs cannot succeed in proving that there is a restrictive servitude that prohibits private development on the Community Property. Plaintiffs, in order to be entitled to summary judgment in their favor, must show that the undisputed material facts show that there is a restrictive servitude that prohibits development on the Community Property.

"Covenants are 'agreement[s] or promise[s] of two or more parties that something is done, will be done, or will not be done,' and are characterized by the type of burden they impose: an affirmative covenant calls for the covenanter to perform an act, while a negative covenant requires the covenanter to refrain from performing one." *Patch v. Springfield Sch. Dist.*, 2009 VT 117, ¶ 8, 187 Vt. 219 (quoting R. Powell, Powell on Real Property § 60.01[2] (M. Wolf ed. 2007)). Negative covenants that restrict owners' uses of their land, known as restrictive covenants, "can be established via a common development scheme for a general-plan development." *Id.*, ¶ 8 (citing *Creed v. Clogston,* 2004 VT 34, ¶¶ 20–21, 176 Vt. 436). Restrictive covenants may be established "(1) through 'explicit written language … in the deed … or another recorded document' and (2) 'by implication … usually ascertained from a common plan of development.'". *Id.* (quoting *Leon N. Weiner & Assocs. v. Krapf,* 623 A.2d 1085, 1088 (Del.1993)). The issue at stake in both parties' motions is whether the Community Property is subject to a restrictive servitude that prohibits its development for private use, and if so, whether it prohibits all development for private use whatsoever, or instead prohibits only development that would interfere with the community use of the lot.

1. Defendants' motion for summary judgment

Defendants first argue that the term "Community Property" does not, on its own, mean that the Covenants impose restrictions on the development of the Community Property. They argue that because "community property" is not a term of art in this context, the use of the phrase "community property" to label the lot, on its own, does not unambiguously create a restrictive covenant prohibiting private development of the lot. Making reasonable inferences in favor of Plaintiffs as the opposing party—the "community property" label for the lot on the survey plans, where all the other lots to be sold are numbered, combined with the restriction on subdividing lots, where the Community Property is below the minimum size, implies that the lot was to remain open for community use and not to be developed for private purposes that would interfere with the community use. Plaintiffs assert further facts that are consistent with that construction of the documents: the later history of the lot—the continued reference to its description as "community property" in later deeds, the fact that Deux Mondes did not sell the lot to an individual owner for development of a residence as it did the (numbered) lots in the plans, the fact that even after the tax sale, subsequent owners did not develop the lot for private purposes and appear to have acquiesced to use of the lot by residents of Cricket Hill, the fact that the lot sold for a relatively low price in the tax sale and to subsequent buyers. The Court cannot at this time rule that the failure to use more express terms in the Declaration eliminates the possibility that a factfinder could conclude that there is a restrictive servitude that limits the private use of the Community Property.

Similarly, the lack of formation of a homeowners' association could be considered by a factfinder in weighing the evidence for and against the implication of a restrictive servitude on the Community Property, but Defendants have not shown that it is dispositive

as a matter of law.  The situation in *In re N. Acres, LLC* related to restrictions on a parcel labeled "common land" on a final plat.  2007 VT 109, ¶ 13, 182 Vt. 618.  However, there is nothing about *In re N. Acres, LLC* that persuades the Court that those facts are the only ones in which a restrictive servitude can be found.

Defendants insist that the tax sale of the Community Property in 1987 removed any conceivable implied restrictions on its development.  Defendants cite a single authority for the proposition that "where property sold for delinquent taxes is assessed without reference to a restrictive covenant, such covenant is sometimes regarded as having been extinguished by the tax sale."  20 Am. Jur. 2d Covenants, Etc. § 232.  The tax sale deed incorporates as a description of the lot in question a description from an earlier deed in which the lot is described as "community property."  Exh. G.  Defendants have not come forward with any further authority, nor has the Court located any such authority, to show that under Vermont law, a tax sale resulting from a subdivision developer's failure to cure a tax delinquency on a lot held by the developer and subject to Covenants along with other parcels in a general-plan development extinguishes the obligations of the new owner to comply with the Covenants that bind all the lots in a development and run with the land.  Although it is undisputed that the Community Property was conveyed pursuant to a tax sale, Defendants have not met their burden to show that because of that fact, they are entitled to judgment as a matter of law.

Defendants further argue that the Community Property has never been subdivided since its creation, so the Covenants' provision restricting further subdivision is inapplicable and irrelevant.  The issue before the Court is not whether the owners of the Community Property may subdivide it.  However, the provision restricting subdivision of parcels into parcels smaller than four acres—in the context of the general-plan development of Cricket Hill, in which numbered parcels of greater than four acres were sold for private residential use and a single lot of fewer than four acres, labeled "community property" rather than being numbered in the original plans submitted at the time of the Declaration of Covenants—may be considered with regard to the question of whether the intention was to retain the lot for community use and restrict it from any development for private use that would interfere with the community use.

Defendants contend that Lot 18 cannot support a septic system, and the only place for a septic system would be on the Community Property.  Further, they point to the Department of Environmental Conservation and Act 250 District Environmental Commission No. 1 approvals for a septic system on the Community Property to support houses on Lot 18 and the Community Property.  To begin with, Defendants have not brought forth any authority from which the Court can conclude that the Wastewater and Act 250 permits regarding development of Lot 18 and the Community Property supersede any express or implied restrictive servitudes governing those parcels.  Further, Defendants have not shown that the current unsuitability of Lot 18 for septic system development

would entitle them to develop the Community Property for private use if the Community Property is burdened by the restrictive servitude that Plaintiffs ask the Court to find, or even that such a consideration is relevant to the issue.

Because Defendants have not shown that Plaintiffs cannot succeed in their claim that the Community Property is subject to a restrictive servitude that would prohibit them from building a residential home or septic system on it, they are not entitled to summary judgment.[2]

2. Plaintiffs' motion for summary judgment

Plaintiffs, in their cross-motion for summary judgment, argue that there are two sources for the conclusion that the Community Property may not be developed for private purposes: the documents that established Cricket Hill, and the characteristics, purposes, and history of the Community Property. Plaintiffs contend that the restrictive covenant against developing the Community Property for private purposes is implied. *See Patch v. Springfield Sch. Dist.*, 2009 VT 117, ¶ 19, 187 Vt. 21.

"A 'general-plan development' is a 'real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude imposed to effectuate a plan of land-use controls for the benefit of the property owners in the development or neighborhood.'" *Creed v. Clogston*, 2004 VT 34, ¶ 20, 176 Vt. 436 (quoting Restatement (3d) of Property–Servitudes § 1.7. "General plan developments 'are generally created by developers who impose the servitudes before any lots or units are sold, but they may also be created by agreement among existing property owners.'" *Id.* (quoting Restatement (3d) of Property–Servitudes § 1.7 cmt. a). The Supreme Court has further specified that in order to establish a general-plan development, there must be a "common declaration of covenants" or an "agreement of … neighbors." *Id*, ¶ 20.

Defendants oppose the application of the doctrine of reciprocal negative easements or implied reciprocal servitudes and argue that the Court in its decision on the motion to dismiss misinterpreted *Patch*. Defendants contend that *Patch* rejected the doctrine. *Patch* relied on *Creed*, in which the Supreme Court declined to conclude that a covenant prohibiting construction of mobile homes on eleven lots of a twenty-lot subdivision also prohibited mobile homes in the remaining lots, in part because the record did not support holding that the neighborhood was a general-plan development. 2004 VT 34, ¶¶ 20–21 (notably, the restriction was contained only in later-sold lots); see *Patch*, 2009 VT 117, ¶ 11. In *Patch*, the Supreme Court held that the subdivision in question was not a general-plan

_____

[2] Defendants' remaining arguments regarding the construction of the Declaration and referenced plans are addressed below in the discussion of Plaintiffs' motion.

development where "[n]either the subdivision plat, nor the first deed, contained any reference to restrictive covenants; only the later deeds contained such reference." *Id*, ¶ 12. "The mere existence of a recorded plat map does not constitute the creation of a general-plan development because the map simply lays out the location of lots within a certain area of land; it gives no indication of any restrictions that might govern those lots." *Id*. The subdivision in this case differs from those in *Creed* and *Patch* in several important respects, including the existence of a Declarations of Covenants that was recorded before the developer conveyed the numbered lots (and years before the tax sale of the Community Property), as well as recorded plans that do not merely lay out the location of lots, but rather, also label the lot in question, uniquely, as "community property." Whereas in *Creed* and *Patch*, "[t]he missing ingredient is a declaration of covenants imposed before the first lot was sold, or a subsequent agreement among all lot owners to impose a set of covenants on the involved land," here, it is undisputed that the declaration of covenants was recorded before the lots were sold. *Id*, ¶ 15.

*Patch* declined to apply the doctrine of implied reciprocal servitudes because, following *Creed*, there could be no inference of a general-plan development in the absence of a declaration of covenants or owners' agreement. *Patch*, 2009 VT 117, ¶ 20. In other words, it rejected the theory that the existence of a general-plan development could itself be implied, and because there was no general-plan development, it would not consider whether a negative servitude could be proven by implication in *Patch*. "A servitude may be implied in a particular deed if a 'general plan' exists, and generally speaking, 'the doctrine is applied when: (1) a common owner subdivides property into a number of lots for sale; (2) the common owner has a general scheme of development for the property as a whole, in which the use of the property will be restricted; (3) the vast majority of subdivided lots contain restrictive covenants which reflect the general scheme; (4) the property against which application of an implied covenant is sought is part of the general scheme of development; and (5) the purchaser of the lot in question has notice, actual or constructive, of the restriction.' " *Khan v. Alpine Haven Prop. Owners' Ass'n, Inc.*, 2016 VT 101, ¶ 30, 203 Vt. 251 (footnote omitted) (quoting *Patch*, 2009 VT 117, ¶ 19).

Whether there is a servitude on the use of the Community Property depends on the language of the instruments in question and the intent at the time of execution. "When the meaning of a declaration is 'clear and unambiguous, ... the instrument must be given effect according to its terms.' " *Highridge Condo. Owners Assn. v. Killington/Pico Ski Resort Partners, LLC*, 2014 VT 120, ¶ 24, 198 Vt. 44 (quoting *Creed*, 2004 VT 34, ¶ 13 (quotation omitted)). "The intention of the parties, not the language used, is the dominating factor, and the circumstances existing at the time of the execution of the deed, the situation of the parties and the subject matter are to be considered." *Welch v. Barrows*, 125 Vt. 500, 504 (1966) (citing *Nelson v. Bacon*, 113 Vt. 161, 169 (1943)); see *Main St. Landing, LLC v. Lake St. Ass'n, Inc.*, 2006 VT 13, ¶ 7, 179 Vt. 583 ("[T]he 'master rule' is that the intent of the parties governs."). "To ascertain the intention of the parties, it is also proper to consider the

circumstances existing at the time the deed was made." *Okemo Mountain, Inc. v. Town of Ludlow Zoning Bd. of Adjustment*, 164 Vt. 447, 452 (1995) (citing *Sheldon Slate Prods. v. Kurjiaka*, 124 Vt. 261, 267 (1964)).  "As a general rule," the Supreme Court has held,

> extrinsic evidence is not admissible to show the intent of the parties to a deed unless the language of the deed is ambiguous. We actually have two ambiguity rules. For both, the question of whether ambiguity exists is one of law. See *Isbrandtsen v. North Branch Corp.,* 150 Vt. 575, 577, 556 A.2d 81, 83 (1988). First, when looking at particular language in a deed, the court must accept the plain meaning of the language and not look to construction aids if the language is not ambiguous. See *Simpson Dev. Corp. v. Herrmann,* 155 Vt. 332, 334–35, 583 A.2d 90, 92 (1990). Second, if the court finds some ambiguity in particular language, it must examine the whole instrument, attempting to determine the intent of the drafters from all of the language and using relevant construction aids. See *Isbrandtsen,* 150 Vt. at 580–81, 556 A.2d at 85 (agreement must be viewed in its entirety; even if inartfully worded or clumsily arranged, writing is not ambiguous if it fairly admits of one interpretation). If the court then finds the writing is ambiguous, the proper interpretation becomes a question of fact, to be determined on all relevant evidence. See *Breslauer v. Fayston Sch. Dist.,* 163 Vt. 416, 425, 659 A.2d 1129, 1135 (1995). If the court does not find the writing ambiguous, it must declare the proper interpretation as a matter of law.

> We allow limited extrinsic evidence of "circumstances surrounding the making of the agreement" in determining whether the writing is ambiguous. See *Isbrandtsen,* 150 Vt. at 579, 556 A.2d at 84. This evidence is relevant, however, only when, in combination with the writing, it supports an interpretation that is different from that reached on the basis of the writing alone, and both are reasonable. See *id.* It may not be used to vary the terms of an unambiguous writing. See *Tilley v. Green Mountain Power Corp.,* 156 Vt. 91, 93–94, 587 A.2d 412, 414 (1991).

*Kipp v. Est. of Chips*, 169 Vt. 102, 107, 732 A.2d 127, 131 (1999).

Plaintiffs' motion recounts that the combination of the recorded Declaration and the plans for the development show that Cricket Hill had a "general plan," and the plan included leaving the Community Property undeveloped so that it could be used by the

residents of Cricket Hill.  Their narrative includes accounts of residents' use of the Community Property over time, Deux Mondes's lack of development of that lot for private use, and ways in which residents have made use of the lot over the years.  Even after Deux Mondes lost ownership of the lot through a tax sale, later owners still did not develop the lot for their private use.  Defendants were also aware, before purchasing the Community Property, that the lot was referenced as "community property" in previous deed descriptions as well as the recorded development plans.

The recorded Covenants and plans demonstrate amply that Deux Mondes created Cricket Hill as a general-plan development, and the Covenants were intended to bind the owners of all lots in Cricket Hill.  The plans label all lots with numbers except for uniquely small lot, which is labeled as "community property."  Exh. B.  The language fairly admits the interpretation that the lot was intended to be used in some manner by the community.  Defendants argue that there is ambiguity, because if the Declaration and the designation of the lot as "community property" in the recorded plans that the Declaration references are ambiguous, then the rule of construction applies that "[r]estrictions will not be extended by implication to include anything not clearly expressed, and doubts must be resolved in favor of the free use of land." *Patch*, 2009 VT 117, ¶ 20 n.5.  That rule of construction only applies, however, if the instrument is determined to be ambiguous, and "the fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous." *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 581 (1988).  When viewed in light of the whole Declaration, the designation of the lot as "community property" appears in the context of the creation of a general plan for a community formed by the development of residential properties laid out in a particular manner, of a particular minimum size, in which a smaller lot was designated "community property" and therefore for community use; and in light of the surrounding circumstances of the deeds of the numbered lots, they were intended to benefit from the Covenants and plan that included a "community property" for their use.  Even the eventual deeds of the Community Property after the tax sale include reference to the description of the lot as "community property."

There is no reasonable second interpretation of Covenants and the referenced plans in which the Community Property is not intended for community use or that the lot designation as "community property" is meaningly and therefore it is intended to simply be another lot to be developed by an individual owner.  Therefore, there is no ambiguity that the intention was for the lot to be used by Cricket Hill residents to some extent, and to the extent that the lot's owner (originally, Deux Mondes) could develop it, such development would be restricted in such a manner that community use of the property could be retained. *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579 (1988) ("Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable.").  The written instruments are silent, however, as to the scope of the residents' use of the Community Property. Plaintiffs contend that all development of the Community Property

for private purposes is prohibited, yet fail to demonstrate with undisputed material facts that the scope of the intended community use of the lot is so great that it excludes all development for private use whatsoever. The scope of the other lot owners' use of the Community Property, and the corresponding restriction on the owner's development of the lot for private use, therefore remain questions of fact.

Plaintiffs' motion succeeds in establishing that (1) Cricket Hill is a general-plan development, (2) the residents of Cricket Hill have some right to use the Community Property, and (3) the owners of the Community Property are correspondingly restricted from using it in a manner that does not interfere the residents' right to use the lot. Plaintiffs will still have to prove the scope of the Cricket Hill lot owners' right to use the Community Property in order for the finder of fact to determine the extent of the corresponding restriction on developing the Community Property. Making all reasonable inferences in favor of the nonmoving party, the extrinsic evidence that Plaintiffs have produced does not support the full extent of the relief they request, namely that the Community Property is subject to a restrictive servitude that prohibits all development on it for its owners' private use. Depending on the finder of fact's consideration of evidence presented at trial, and consistent with the rule of construction that the scope of a restriction should be resolved in favor of free use, the scope of community use of the lot may be so minimal as to permit some or all of Defendants' proposed development.

In accordance with the foregoing considerations, Plaintiffs' motion is granted to a limited extent: Cricket Hill is a general-plan development in which residents of the numbered lots depicted in its recorded plans have some right to use the Community Property, and the owners of the Community Property are correspondingly restricted from developing the lot for their private use in a manner that interferes with the community use of the lot. Plaintiffs' motion is denied in part because the scope of the community's right to use the lot, and the corresponding restriction on developing it, remain in dispute.

Order

Defendants' motion for summary judgment is denied. Plaintiffs' motion for summary judgment is granted in part, denied in part as described above.

Electronically signed on May 22, 2025 pursuant to V.R.E.F. 9(d)

*Alexander N. Burke*
_____
Alexander N. Burke
Superior Court Judge